[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 13-13171

_____

D.C. Docket No. 1:12-cr-20219-WJZ-2

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

YOSANY SOSA,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(February 2, 2015)

Before HULL and JULIE CARNES, Circuit Judges, and ROTHSTEIN,[*] District
Judge.

HULL, Circuit Judge:

_____

[*]Honorable Barbara J. Rothstein, United States District Judge for the Western District of
Washington, sitting by designation.

After a jury trial, Yosany Sosa appeals his convictions for one count of conspiracy to commit health care fraud, in violation of 18 U.S.C. §§ 1349 and 1347; eight counts of health care fraud, in violation of 18 U.S.C. § 1347; one count of conspiracy to pay health care kickbacks, in violation of 18 U.S.C. §§ 371 and 1320a-7b(b)(2)(A); and three counts of payment of kickbacks in connection with a federal health care program, in violation of 42 U.S.C. § 1320a-7b(b)(2)(A). Sosa also appeals his total 102-month sentence. Sosa contends that the government failed to introduce evidence to sustain his convictions, that the prosecution's closing statements amounted to misconduct requiring reversal, and that the district court erred in calculating his advisory sentencing guidelines range. After a careful review of the record and the briefs, and with the benefit of oral argument, we affirm Sosa's convictions and sentence.

## I. BACKGROUND

On March 29, 2012, a federal grand jury returned a 15-count indictment against defendant-appellant Sosa and Arsenio Leon. The indictment charged Sosa and Leon each with one count of conspiracy to commit health care fraud, eight counts of health care fraud, one count of conspiracy to pay health care kickbacks, and five counts of payment of kickbacks in connection with a federal health care program. The kickback counts specifically alleged that Sosa and Leon paid kickbacks of $1,550 on or around May 21, 2011; $2,200 on or around June 28,

2

2011; $2,250 on or around July 11, 2011; $2,400 on or around August 1, 2011; and $2,400 on or around August 8, 2011. Sosa and Leon each pleaded not guilty, and the pair was tried jointly.

Because Sosa challenges, inter alia, the sufficiency of the evidence, we begin by recounting the evidence presented at trial relating to his convictions.

## A.    Evidence Presented at Trial[1]

On May 31, 2002, Leon incorporated Discovery Therapy, Inc. ("Discovery"). Nearly nine years later, on April 21, 2011, Leon opened a bank account for Discovery at J.P. Morgan Chase and hired a company named DNA Billing to prepare Medicare claims for Discovery. On April 25, 2011, Discovery applied to become an authorized provider of Medicare Part C services through Blue Cross Blue Shield ("BCBS"), which administers the Medicare Part C program.

Discovery eventually became a licensed Medicare Part C provider, and listed itself as a "convenient care center," which is a clinic designed to provide physical examinations, injections, and treatment for non-serious illnesses.[2] In connection with Discovery's licensing as a Medicare Part C provider, Leon filed an

---

[1]Where, as here, a defendant challenges the sufficiency of the evidence supporting his conviction, we review the evidence in the light most favorable to the government. United States v. Wright, 392 F.3d 1269, 1273 (11th Cir. 2004).

[2]We refer to Discovery as "the clinic" at times in this opinion because Discovery self-identified as this type of facility.

3

authorization agreement with BCBS, which stated that all Medicare claim payments made to Discovery should be directly deposited into the J.P. Morgan Chase bank account that Leon opened on April 21, 2011.

Beginning on May 30, 2011, Discovery began to submit Medicare Part C claims to BCBS. On June 29, 2011, while Discovery continued to submit Medicare claims to BCBS, Leon added Sosa as an authorized signatory on Discovery's J.P. Morgan Chase bank account. Sosa had invested $10,000 in Discovery and had become a partner in the enterprise.

Sosa and Leon eventually withdrew about $119,000 each from Discovery's bank account. Sosa's withdrawals included $30,000 in checks written to Y&R Medical Center Group, a company Sosa created but never opened, while the rest of Sosa's profits were distributed directly to him.

Between May 30, 2011 and August 19, 2011, Discovery ostensibly served as a community health clinic and provided treatment for 12 Medicare Part C patients for whom it billed BCBS. Nearly all the Medicare Part C claims Discovery submitted to BCBS were fraudulent because they were for pharmaceutical injections and infusions that Discovery's patients did not receive.

4

Discovery implemented its fraud scheme as follows.  The clinic hired an individual named Miguel Angel Milian Martinez[3] to recruit patients who would seek medical services at Discovery.  Milian Martinez found, recruited, and paid individuals who were HIV-positive or suffering from AIDS to come to the clinic for so-called treatments.  These "patients" would receive "treatment" in the form of vitamin shots or protein injections.  However, Discovery would then submit Medicare claims to BCBS indicating that these patients had received doses of expensive drugs, frequently octreotide depot.  But Discovery never even purchased octreotide depot, let alone provided patients with injections of the drug.

For example, Discovery paid Edward Caldero $450 to $500 in cash every week for approximately three months to be a "patient" at the clinic.  Although Discovery submitted claims stating that Caldero had received 12 injections of octreotide depot in July 2011—including three injections all on July 1, 2011, and another three injections on July 15, 2011—Caldero never received octreotide depot injections or received three injections of any substance on any single day.  Instead of receiving octreotide, Caldero received injections of Vitamin C or Vitamin B-12.  After receiving his injections, Caldero would "wait around" Discovery's offices for a while before someone would "take [him] to the side and slip [him] the money" he

---

[3]The government introduced a Florida Highway Safety and Motor Vehicle record listing this individual's name as "Miguel A Milian Martinez."  Counsel and witnesses referred to him at various times during the trial as "Miguel Milian Martinez," "Miguel Angel Milian," or simply "Milian Martinez."  For clarity, we refer to this individual as Milian Martinez.

was promised.  Although Sosa never personally paid Caldero, Caldero testified that Sosa hung around the clinic, transported patients to and from Discovery's offices, and even gave Caldero rides at times.  In sum, Discovery billed $143,450.65 for Caldero's "treatment," and BCBS paid Discovery $90,701.20 for services purportedly rendered to Caldero.

Similarly, Discovery paid Gustov Llerena, an HIV-positive patient suffering from AIDS and affected by bipolar disorder, $150 a week for three to four weeks to go to Discovery for "treatment for neuropathy."  However, when he went to the clinic, Llerena received only shots of Vitamin B-12.  Llerena never received infusions of any drug during his visits to Discovery, and he never received more than one injection per visit.  But Discovery submitted claims to BCBS that indicated Llerena had received multiple injections and infusions on single days, including on June 3, 2011, June 6, 2011, and June 10, 2011.  Llerena stopped going to Discovery after he realized that "there was no treatment" and an individual working at Discovery wrongly informed him that he had syphilis.  When asked to identify anyone he knew to be associated with the clinic, Llerena identified Sosa.

Another former patient at Discovery, Kenneth Mackens, went to the clinic one to three times a week for six weeks in 2011.  Mackens, who is HIV-positive, went to Discovery because he "needed the money."  When Mackens went to the clinic, he would sometimes receive a shot, which the people at the clinic told him

6

was of a protein. Although Discovery submitted claims that said Mackens received injections of octreotide, Mackens never received any treatments of that drug. On cross-examination, Mackens admitted that he previously had used aliases and that he sometimes used cocaine and marijuana.

These patients and others were identified by Milian Martinez, the recruiter, whom Discovery paid $43,000 for services over a period of about three months. The payments to Milian Martinez included checks signed by Sosa for $2,250 on July 11, 2011; for $2,400 on August 1, 2011; and for $2,400 on August 8, 2011. In an interview with law enforcement, Sosa admitted that he knew that Milian Martinez was in charge of bringing patients to the clinic and that the check was payment for bringing those patients to the clinic. Sosa also knew that the patients were being paid and that it was illegal to pay the patients. Nonetheless, Sosa signed Milian Martinez's checks and included memo lines that indicated they were for "transport."

The fraud continued undetected from May 30, 2011 through August 17, 2011, when BCBS became suspicious of some of Discovery's billing. BCBS detected possible fraud after noting that Discovery had submitted claims indicating that patients had received injections of octreotide depot on consecutive days, even though octreotide depot is a long-acting drug that is absorbed in large muscles over the course of a month. Further, BCBS's policy does not allow for patients to

7

receive more than one treatment of the drug in a four-week span.  BCBS instituted controls on Discovery's claims account by August 19, 2011.  But by then, Discovery had billed BCBS for $1,244,088.13 in Medicare claims for 12 patients, and BCBS had already paid the clinic $443,000.65 for Medicare Part C claims. During the final 52 days of this 82-day fraud, Sosa was a signatory on Discovery's bank account.

On Monday, September 12, 2011, BCBS auditor Mary Tejada and two investigators visited Discovery as part of BCBS's probe into Discovery's suspected fraudulent billing.  The clinic was located on the second floor of a strip mall west of Miami, and it included a waiting room, a physical therapy room, an exam room, and what appeared to be a laboratory room.  Tejada arrived at approximately 1:00 p.m.—during Discovery's stated business hours, which ran from 9:00 a.m. to 3:00 p.m.  Although the visit occurred during the middle of official hours, the only two people present at Discovery were Leon, who identified himself as the owner, and a woman who identified herself as Leon's wife.  Dr. Hector Maldonado, who was listed as the physician in charge at Discovery, was not present, even though his official office hours at the clinic ran from 9:00 a.m. to 3:00 p.m. on Mondays.

During Tejada's visit, Leon took Tejada and the investigators to the laboratory room and opened the room's refrigerator, which contained fewer than

six small vials of substances and some small containers similar to urine containers. Leon told the investigator that he did not know what was in the vials or the containers because he did not provide the services at Discovery. In fact, Leon said he had "no idea" what services were performed in the office he owned.

The investigators also asked Leon to provide Discovery's medical records for an audit. Leon responded that he had given everything he had to another BCBS investigator who had visited Discovery previously. But BCBS had not previously received any medical records from Discovery. Tejada, the investigators, and Leon then searched Discovery's offices for any in-house medical records. They found none.

Leon also told Tejada that his office clerk, who was not working at the time, was "the one in charge of all that" and would be able to answer Tejada's questions. By the end of the day, Leon had removed Sosa as a signatory on Discovery's J.P. Morgan Chase bank account. About a week and a half later, Tejada received by mail the files for seven of Discovery's 12 patients. She never received the other files.

A review of Discovery's financial records and the claims it submitted to BCBS revealed that, although the clinic billed BCBS for 29,245 units of drugs totaling $1,128,830.00, it had purchased only 187 units of drugs for a total of $2,613.20.

On April 2, 2012, Agent Suzzette Bohmer, who is a special agent for the Office of Personnel Management's Office of the Inspector General, interviewed Sosa in connection with the Office of Personnel Management's investigation into Discovery's fraudulent billing practices.  After being given his <u>Miranda</u> rights, Sosa admitted that he had written at least one check to Milian Martinez, that he knew Milian Martinez was in charge of bringing patients to the clinic, and that the check was payment for bringing those patients to the clinic.  Sosa also admitted that he knew that the patients were being paid and that it was illegal to pay the patients.

At the conclusion of the government's case in chief, Sosa moved for a judgment of acquittal on all counts.  The district court reserved its ruling on the motion.

During the defense's case in chief, Sosa testified and denied that he ever told Agent Bohmer that Milian Martinez was referring patients to Discovery.  Sosa also denied that he ever told Agent Bohmer that he knew Discovery's patients were being paid.

Before closing arguments, Sosa renewed his motion for judgment of acquittal, which the district court denied.

**B.    Jury Verdict**

On September 21, 2012, after approximately three hours of deliberations, the jury returned a verdict. The jury found Leon guilty on all counts and found Sosa guilty of 13 of the 15 counts against him. The jury found Sosa guilty of one count of conspiracy to commit health care fraud, eight counts of health care fraud, one count of conspiracy to pay health care kickbacks, and three counts of payment of kickbacks in connection with a federal health care program (the three counts relating to the kickbacks allegedly paid on or around July 11, 2011, August 1, 2011, and August 8, 2011). The jury found Sosa not guilty of two counts of payment of kickbacks in connection with a federal health care program (the two counts relating to the kickbacks allegedly paid on or around May 21, 2011 and June 28, 2011).

Sosa timely appealed.

## II. SUFFICIENCY OF THE EVIDENCE

On appeal, Sosa first argues that the government introduced insufficient evidence to support his convictions.

We review de novo the sufficiency of the evidence, "viewing the evidence in the light most favorable to the government, with all reasonable inferences and credibility choices made in the government's favor." United States v. Wright, 392 F.3d 1269, 1273 (11th Cir. 2004) (quotation marks omitted and alterations

adopted).  We will affirm a conviction where "a reasonable jury could find the defendant's guilt beyond a reasonable doubt." United States v. Utter, 97 F.3d 509, 512 (11th Cir. 1996).

## A.    Conspiracy Charges

Sosa argues that the government presented insufficient evidence to sustain his convictions for conspiracy to commit health care fraud and conspiracy to pay health care kickbacks.  Specifically, Sosa contends that the government failed to prove an agreement to defraud Medicare, an agreement to pay kickbacks, or that Sosa knowingly and voluntarily joined any such agreement.

"For a defendant to be found guilty of conspiracy, the government must prove beyond a reasonable doubt (1) that a conspiracy existed; (2) that the defendant knew of it; and (3) that the defendant, with knowledge, voluntarily joined it." United States v. Vernon, 723 F.3d 1234, 1273 (11th Cir. 2013) (quotation marks omitted).  This Court has made clear that, "[b]ecause the crime of conspiracy is predominantly mental in composition, it is frequently necessary to resort to circumstantial evidence to prove its elements."[4] United States v. Toler, 144 F.3d 1423, 1426 (11th Cir. 1998) (quotation marks and citations omitted).

With regard to the first element, "the very nature of conspiracy frequently requires that the existence of an agreement be proved by inferences from the

---

[4]"In judging the sufficiency of the evidence, the standard applied is the same whether the evidence is direct or circumstantial." Utter, 97 F.3d at 512.

conduct of the alleged participants or from circumstantial evidence of a scheme." Vernon, 723 F.3d at 1273 (quotation marks omitted and alteration adopted). In other words, "the government need not demonstrate the existence of a formal agreement, but may instead demonstrate by circumstantial evidence a meeting of the minds to commit an unlawful act." Toler, 144 F.3d at 1426 (quotation marks and citations omitted).

Second, in regard to the defendant's knowledge, "the government need not prove that the defendant knew all of the details or participated in every aspect of the conspiracy. Rather, the government must only prove that the defendant knew the essential nature of the conspiracy." United States v. Miranda, 425 F.3d 953, 959 (11th Cir. 2005) (quotation marks omitted and alterations adopted). To that end, a defendant can be convicted of conspiracy if the evidence demonstrates that he was aware of the conspiracy's essential nature, even if he did not know all of its details, played only a minor role in the overall scheme, did not have direct contact with other alleged co-conspirators, or did not participate in every stage of the conspiracy. United States v. Reeves, 742 F.3d 487, 497-98 (11th Cir. 2014).

Finally, as to the voluntary joining element, "the government can meet this burden through proof of surrounding circumstances such as acts committed by the defendant which furthered the purpose of the conspiracy." Vernon, 723 F.3d at 1274 (quotation marks omitted).

13

In sum, "[w]e will affirm a conspiracy conviction when the circumstances surrounding a person's presence at the scene of conspiratorial activity are so obvious that knowledge of its character can fairly be attributed to him." Id. at 1273-74.

1.    Conspiracy to Commit Health Care Fraud

Here, the government presented abundant evidence for a reasonable jury to find beyond a reasonable doubt that a conspiracy to defraud Medicare existed, that Sosa knew of the conspiracy, and that Sosa knowingly and voluntarily joined the conspiracy.

The evidence of Sosa knowingly and voluntarily entering into an agreement to commit health care fraud includes the following: (1) Sosa invested at least $10,000 in Discovery, which fraudulently billed Medicare, through its administrator BCBS, $1,244,088.13 in Medicare Part C claims for just 12 "patients" from May 30, 2011 to August 19, 2011; (2) Sosa was a signatory on the bank account of the fraudulent business from June 29, 2011 through September 12, 2011; (3) the time Sosa was a signatory on the bank account included 52 days of Discovery's fraudulent billing; (4) Sosa wrote checks on behalf of the company and had access to the bank account which showed Discovery spent only about $8,000 on pharmaceuticals, despite submitting claims for more than $1,200,000; (5) Sosa and Leon took approximately equal shares from Discovery's fraudulent

14

profits; (6) Sosa withdrew approximately $119,000 for himself from Discovery's bank account within its first three months of operation, even though he knew it had only six or seven "patients"; (7) Sosa gave "patients" rides to Discovery for their treatments; and (8) multiple "patients" identified Sosa as having been associated with or in the clinic when they received so-called treatments that were a part of the fraud scheme.

Although mostly circumstantial, this evidence amply supports Sosa's conviction for conspiracy to commit health care fraud. The shared profits and Sosa's access to Discovery's bank account are circumstantial evidence supporting the jury's finding that an agreement existed. See Toler, 144 F.3d at 1426. Similarly, Sosa's control over Discovery's bank account, his presence at the clinic, his knowledge of the small number of patients at the clinic, and his access to financial statements that indicated the limited drugs purchased and Discovery's high billing support the jury's finding that Sosa had knowledge of the essential nature of the conspiracy. See Miranda, 425 F.3d at 959. Finally, Sosa's writing checks on behalf of Discovery and driving patients to and from the clinic are acts in furtherance of the conspiracy and support the jury's finding that he voluntarily entered into the conspiracy. See Vernon, 723 F.3d at 1274.

15

2.      Conspiracy to Pay Health Care Kickbacks

Here, the government also presented sufficient evidence for a reasonable jury to find beyond a reasonable doubt that a conspiracy to pay health care kickbacks existed, that Sosa knew of the conspiracy, and that Sosa knowingly and voluntarily joined the conspiracy.

Because the conspiracy to pay health care kickbacks was associated with the larger conspiracy to commit health care fraud, much of the evidence is overlapping.  And it is similarly sufficient to support Sosa's conviction for conspiracy to pay health care kickbacks.  The evidence on this count includes the following: (1) Sosa invested at least $10,000 in Discovery, which paid HIV-positive and AIDS patients to seek treatment at its clinic; (2) Sosa was a signatory on Discovery's bank account from June 29, 2011 through September 12, 2011; (3) Sosa wrote checks on behalf of the company; (4) Sosa had access to Discovery's bank account, from which the company paid Milian Martinez, the patient recruiter, $43,000 over a period of about three months; (5) Sosa knew that Milian Martinez was in charge of bringing "patients" to the clinic; (6) in an interview with Tejada, Sosa admitted that the patients were being paid and that he knew it was illegal to pay the "patients"; (7) Sosa signed several of Discovery's checks to Milian Martinez as payment for referring and bringing patients to the clinic, and Sosa

16

included memo lines that indicated they were for "transport"; and (8) Sosa gave "patients" rides to Discovery for their treatments.

Although mostly circumstantial, the evidence again supports Sosa's conviction on this count.  The jury's finding that there was an agreement is supported by the evidence of Sosa's investment in Discovery; Sosa's access to Discovery's bank account; and Sosa's admissions that he knew Milian Martinez was recruiting patients, that he knew the patients were being paid, that he knew it was illegal to pay patients, and that he wrote the check to Milian Martinez anyway. See Toler, 144 F.3d at 1426.  Similarly, those admissions are sufficient to support the jury's finding that he had knowledge of the essential nature of the conspiracy. See Miranda, 425 F.3d at 959.  Finally, Sosa's writing checks to Milian Martinez on behalf of Discovery and driving patients to and from the clinic are acts in furtherance of the conspiracy and support the jury's finding that he voluntarily entered into the conspiracy to pay health care kickbacks.  See Vernon, 723 F.3d at 1274.

## B.    Health Care Fraud

Sosa next argues that the government introduced insufficient evidence to sustain his convictions on eight counts of health care fraud.  Specifically, Sosa contends that "there was no evidence presented by the government that could prove beyond a reasonable doubt that Sosa made any type of material

17

misrepresentation."  Sosa notes that there was no evidence that he directly paid

kickbacks to any patients or that he prepared Discovery's billing records or claims

sent to BCBS.

> Section 1347(a) of the health care fraud statute provides that:
>
> Whoever knowingly and willfully executes, or attempts to execute, a scheme or artifice—
>> (1) to defraud any health care benefit program; or
>> (2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program,
>
> in connection with the delivery of or payment for health care benefits, items, or services, shall be fined under this title or imprisoned not more than 10 years, or both.

18 U.S.C. § 1347(a).  Under § 1347(a), the government must show that the

defendant knew that the submitted claims were false.  United States v. Medina, 485

F.3d 1291, 1297 (11th Cir. 2007).  Claims are false if they are, inter alia, for

treatment that was "not medically necessary," or for treatment that was "not

delivered to the patients."  See id. at 1304.

A defendant may be convicted of health care fraud if he aid, abets, counsels,

induces, or procures the commission of the offense, or if he willfully causes the

offense to be committed.  See 18 U.S.C. § 2.  Under 18 U.S.C. § 2, aiding and

abetting is not a separate federal crime, "but rather an alternative charge that

permits one to be found guilty as a principal for aiding or procuring someone else

to commit the offense." United States v. Hornaday, 392 F.3d 1306, 1311 (11th Cir. 2004) (quotation mark omitted).

"Under an aiding and abetting theory, the government must prove that the defendant in some way associated himself with the criminal venture, that he wished to bring it about, and that he sought by his actions to make it succeed." United States v. Broadwell, 870 F.2d 594, 608 (11th Cir. 1989). Thus, to convict under a theory of aiding and abetting, the government must prove that (1) someone committed the substantive offense; (2) the defendant contributed to and furthered the offense; and (3) the defendant intended to aid in its commission. United States v. Tagg, 572 F.3d 1320, 1324 (11th Cir. 2009). Put simply, "a person is liable under § 2 for aiding and abetting a crime if (and only if) he (1) takes an affirmative act in furtherance of that offense, (2) with the intent of facilitating the offense's commission." Rosemond v. United States, 572 U.S. ___, ___, 134 S. Ct. 1240, 1245 (2014).

Evidence supporting a defendant's conviction under an aiding and abetting theory may be direct or circumstantial. United States v. Smith, 700 F.2d 627, 632 (11th Cir. 1983). A defendant can be properly convicted of aiding and abetting "even when he has not personally committed all the acts constituting the elements of the substantive crime aided." Hornaday, 392 F.3d at 1311 (quotation marks omitted and alteration adopted).

In this case, the evidence supports Sosa's convictions for § 1347 health care fraud offenses. The government presented evidence that Discovery served as the vehicle to operate health care fraud in the form of false Medicare Part C claims submitted to BCBS. The fraud was effectuated by Discovery "treating" patients with vitamins and low-cost drugs, while billing Medicare Part C for expensive drugs that were never used and for additional treatments that never occurred. Accordingly, the recruitment of the patients—who were paid to receive Discovery's "services"—was an integral part of a health care fraud in which Discovery submitted claims for treatments that were "not delivered to the patients." See Medina, 485 F.3d at 1304. And, although it is unclear who personally submitted the false claims to BCBS, the government introduced evidence that Sosa himself aided and abetted the health care fraud by transporting "patients" to and from the clinic and by signing checks for Milian Martinez, the patient recruiter. See Broadwell, 870 F.2d at 608.

In light of this evidence, a reasonable jury could find beyond a reasonable doubt that Sosa was guilty of health care fraud.

## C.    Payment of Health Care Kickbacks

Sosa also contends that the government introduced insufficient evidence to sustain his three convictions for payment of health care kickbacks under § 1320a-7b(b)(2)(A). Specifically, Sosa argues that the government failed to establish that

20

Sosa knew that the check he signed for Milian Martinez was reimbursement for illegal payments paid to "patients" brought to Discovery, rather than payment for the service of transporting the patients.

The Anti-Kickback statute makes it a criminal offense if a person "knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person . . . to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program."  42 U.S.C. § 1320a-7b(b)(2)(A).

The § 1320a-7b statute "is not a highly technical tax or financial regulation that poses a danger of ensnaring persons engaged in apparently innocent conduct. Indeed, the giving or taking of kickbacks for medical referrals is hardly the sort of activity a person might expect to be legal."  United States v. Starks, 157 F.3d 833, 838 (11th Cir. 1998).

In order to find that a person acted willfully in violation of § 1320a-7b, the person must have acted "'voluntarily and purposely, with the specific intent to do something the law forbids, that is with a bad purpose, either to disobey or disregard the law.'"  Vernon, 723 F.3d at 1256 (quoting Starks, 157 F.3d at 838).  However,

21

the defendant need not have known that a specific referral arrangement violated the law. Id.

In this case, sufficient evidence demonstrates that Sosa willfully committed the payment of kickbacks on or around July 11, 2011, August 1, 2011, and August 8, 2011. The government introduced evidence that Sosa wrote checks for Milian Martinez for $2,250 on July 11, 2011; for $2,400 on August 1, 2011; and for $2,400 on August 8, 2011. In an interview with law enforcement, Sosa admitted that he knew that Milian Martinez was in charge of bringing patients to the clinic, that the check was payment to Milian Martinez for bringing those patients to the clinic, and that the patients also were being paid and that it was illegal to pay the patients. Nonetheless, Sosa signed Milian Martinez's checks and included memo lines that indicated they were for "transport."

Given this and the other trial evidence recounted above, a reasonable jury could find beyond a reasonable doubt that Sosa's payments to Milian Martinez, on behalf of Discovery, constituted kickbacks for the referral of patients. The amounts of each check, combined with their frequency, support the inference that Sosa knew the checks were not merely payment for driving patients to and from the clinic. Furthermore, Sosa's admission in an interview that he knew the patients were being paid and that it was illegal to pay the patients supports the jury's conclusion that Sosa made the payments not for Milian Martinez's livery services

22

but as kickbacks for the referral of patients—that is, "voluntarily and purposely, with the specific intent to do something the law forbids." See Vernon, 723 F.3d at 1256.

Accordingly, the government introduced sufficient evidence to support Sosa's three convictions for payment of kickbacks.

### III. PROSECUTORIAL MISCONDUCT

On appeal, Sosa next argues that the government made improper statements during closing arguments that were so prejudicial as to require a new trial. Specifically, Sosa contends that the prosecution vouched for the credibility of witnesses, expressed personal opinions, and exhorted the jurors to convict on the basis of inflammatory and improper considerations. During the trial, Sosa did not object to the closing arguments, and he raises this issue for the first time on appeal.

We generally review de novo a claim of prosecutorial misconduct during closing arguments because it is a mixed question of law and fact. United States v. Eckhardt, 466 F.3d 938, 947 (11th Cir. 2006). However, where, as here, a defendant fails to object to an error before the district court, we review for plain error. United States v. Newton, 44 F.3d 913, 920 (11th Cir. 1994). To demonstrate plain error, the defendant must show that there is (1) error, (2) that is plain, (3) "that affects substantial rights," and (4) "that seriously affects the

fairness, integrity, or public reputation of judicial proceedings." United States v. Dortch, 696 F.3d 1104, 1112 (11th Cir. 2012).

"To establish prosecutorial misconduct, (1) the remarks must be improper, and (2) the remarks must prejudicially affect the substantial rights of the defendant." Eckhardt, 466 F.3d at 947 (quotation marks omitted). "A defendant's substantial rights are prejudicially affected when a reasonable probability arises that, but for the remarks, the outcome of the trial would have been different." Id. "When the record contains sufficient independent evidence of guilt, any error is harmless." Id.

## A.    Vouching for Witnesses' Credibility

Sosa first contends that the prosecutor improperly vouched for witnesses' credibility by (1) asking why Agent Bohmer would perjure herself and stating that it was important for the jurors to believe Agent Bohmer, and (2) commenting on the truthfulness of the testimony of witness Mackens.

"Ordinarily, it is improper for a prosecutor to bolster a witness's testimony by vouching for that witness's credibility." United States v. Bernal-Benitez, 594 F.3d 1303, 1313 (11th Cir. 2010). A prosecutor's comments amount to improper vouching if the jury could reasonably believe that the prosecutor was expressing a personal belief in the witness's credibility. Id. "A prosecutor's comments can fail this test in two ways: (1) by placing the prestige of the government behind the

24

witness, or (2) by indicating that information not before the jury supports the witness's credibility." Id. at 1313-14.

"The rule against bolstering does not, however, prevent the prosecutor from commenting on a witness's credibility, which can be central to the government's case." Id. at 1314. Thus, "[m]erely acknowledging that adverse legal consequences" flow from perjury does not constitute improper bolstering or vouching. Id. Additionally, we have recognized that a "fair response" exception to the general rule against vouching exists, which "entitles a prosecutor to respond to arguments advanced by defense counsel in his or her statement to the jury." United States v. Lopez, 590 F.3d 1238, 1256 (11th Cir. 2009).

Here, Sosa has failed to show that the district court plainly erred by allowing the government to make the statements he claims amount to improper vouching.

1.    The Prosecutor's Comments about Agent Bohmer

Agent Bohmer testified that Sosa had admitted to her that he knew Milian Martinez was responsible for bringing patients to the clinic, that he had written a check to Milian Martinez, and that this check was payment for Milian Martinez's services. In his own testimony, however, Sosa denied that he had ever told the agent that Milian Martinez was referring patients to Discovery or that he knew that Discovery's patients were being paid.

25

In his summation, the prosecutor contrasted the credibility of the agent with Sosa's lack of credibility by pointing out the absence of motivation for the agent to testify falsely, as well as the untruthful demeanor and selective memory of Sosa:

> Why would a federal agent is going to [sic] perjure herself for this case? No way. You watched [Sosa's] demeanor. You heard the way he couldn't answer anything separate because he's lying. When his lawyer asked him questions he had no problem answering. When I asked him he couldn't remember. Agent Bohmer told you what she knew. Why is she going to[,] in this case[,] make something up?

As anticipated by the prosecutor, Sosa's counsel attacked Agent Bohmer's credibility in his own closing arguments:

> You have had the opportunity the last three days to evaluate the evidence. To look at what the state had. I'll be candid. It comes down to Agent Bohmer's testimony. Of all the exhibits, everything that's been presented, the testimony alone of one witness is what this case comes down to. The testimony alone. . . .
>
> What was Agent Bohmer's testimony[? It] was that Mr. Sosa six months after leaving Discovery Medical was interviewed. She wrote out a statement, said you acknowledge your right and had her sign it. She had a pen, she had a piece of paper. The FBI's budget at least provide her this much. Did you videotape this interrogation? The local police have videos in their car. No. Well, did you record it? Everybody for the last five years had had a recorder on. Well, what exactly was it Mr. Sosa said to you? Did you have him write out a declaration? I hereby know that kickbacks are illegal. Miguel Milian was paying kickbacks. Did you do this? No. . . . That's a reason to wonder. Why, why?

26

(Paragraph breaks added).

In rebuttal, the prosecutor agreed that Agent Bohmer's testimony was important to the government's case and responded to the defense counsel's attack on the agent's credibility:

> Did [Sosa] impress you as one who was telling the truth? That's up to you to decide. Did the witness have any reason not to tell the truth? Did this man have any reason not to tell the truth? Did he have any reason to lie what he really told Agent Bohmer, of course they did. If you believe Agent Bohmer, essentially he confessed. He told Agent Bohmer he knew the checks that he wrote and by implication they went to Miguel Milian Martinez, was the name of the patient. He said to Agent Bohmer he knew the patients were getting it. He didn't know how much but he knew they were being paid. That shows he was guilty. It is important that you believe Agent Bohmer. If you believe Agent Bohmer[,] he's guilty.
>
> You also have to ask did the witness have an interest in the outcome of the case? Who had more personal interest in the outcome of the case th[a]n this man [Sosa]?

(Paragraph breaks added).

This context reveals that, in asking why Agent Bohmer would perjure herself, the prosecutor was not "placing the prestige of the government behind a witness," but "[m]erely acknowledging that adverse legal consequences" flow from perjury. See Bernal-Benitez, 594 F.3d at 1314; United States v. Eley, 723 F.2d 1522, 1525-26 (11th Cir. 1984) (finding no plain error or improper vouching in prosecutor's argument that government witnesses with many years of service

27

had no reason to lie, while defendant had "great reason to lie"). Accordingly, even assuming an error with regard to this comment, the latter did not constitute plain error.[5]

Similarly, to the extent Sosa challenges the propriety of the prosecutor's statement that it was important for the jurors to believe Agent Bohmer, that statement did not constitute bolstering, but was merely an acknowledgment of defendant Sosa's own argument that Agent Bohmer's testimony was crucial to the government's case. See Bernal-Benitez, 594 F.3d at 1314. Therefore, again even assuming error, there was no plain error here.[6]

2.    The Prosecutor's Comments about Witness Mackens

As to witness Mackens, the government urged the jurors to consider the evidence before them when weighing the credibility of witnesses who testified that they were patients at Discovery, including Mackens:

> In deciding whether you believe, or do not believe, any witness, I suggest you [ask] yourself a few questions. Did the witness impress you as one who was telling the truth? Not what's your impression of whether or not the person was telling the truth.

---

[5]Additionally, we note that district courts will be justifiably reluctant to intervene in closing arguments absent an objection by the other party.

[6]Furthermore, the prosecutor made the statement about the importance of Bohmer's testimony in the government's rebuttal only after Sosa's defense counsel argued that the entire case "comes down to Agent Bohmer's testimony," which defense counsel attacked as not credible. Thus, this comment was arguably appropriate under the fair response rule. See Lopez, 590 F.3d at 1256.

Mr. Mackens and Mr. Caldero and Mr. Ore, sure, they have convictions. Mr. Mackens freely admitted he's used drugs, used other aliases. He came in under oath he was accepting money when he shouldn't have done it. Why would you disbelieve this person, one willing to come in and telling you what he did wrong. He just accepted money. They to get [sic] all of the shots. Why would he come in and admit? Of course there was fraud and he admitted it. As you saw this morning who provided the only defense at all, that it was Miguel Milian.

A careful review of these statements reveals that the prosecutor never vouched for witness Mackens's truthfulness, but instead merely argued that Mackens's credibility was enhanced by his willingness to admit to his own wrongdoing, including acknowledging that he had accepted payments for visiting Discovery, that he had used drugs, and that he had used aliases. The prosecutor was simply "commenting on a witness's credibility, which can be central to the government's case." See id. That being so, Sosa has shown no error, plain or otherwise, as to this statement.

## B.    Expressing Personal Opinions

Sosa also argues that the prosecutor improperly expressed his personal opinions when he (1) stated that the defense that Sosa was an innocent bystander was "not true" and (2) stated that Sosa's testimony that Milian Martinez was the mastermind was "just not true."

29

Prosecutors have "a duty to refrain from commenting on their personal views on a defendant's guilt and the evidence." Bernal-Benitez, 594 F.3d at 1315. However, "the prosecutor may suggest what the jury should find from the evidence before it." Id. "'An attorney's statements that indicate his opinion or knowledge of the case as theretofore presented before the court and jury are permissible if the attorney makes it clear that the conclusions he is urging are conclusions to be drawn from the evidence.'" Id. (quoting United States v. Johns, 734 F.2d 657, 663 (11th Cir. 1984)) (alteration adopted).

Here, Sosa has failed to show any error with regard to the prosecutor's statements that allegedly amounted to improper expressions of personal opinion.

1.      The Prosecutor's Comment that Sosa's Defense was "Not True"

When discussing the government's burden to prove that the defendants acted with the intent to defraud, the prosecution argued that the jury should find that Sosa and Leon were not merely innocent bystanders:

> [Sosa and Leon] are saying[, "]I had no idea about all of this.  I was duped. I was an innocent bystander.["] That's not true.  I will talk about each of them separately because there are two defendants here.  You will have to consider what each one of them knew.  You will have to consider them separately.

The relevant context shows that when the prosecutor stated that the "innocent bystanders" defense was "not true," he immediately followed that statement by asking the jury to consider the evidence concerning what the

30

defendants knew.  Accordingly, Sosa has failed to establish any error because the prosecutor made it sufficiently clear that he was urging the jury to conclude that Sosa's defense was untrue based on a consideration of the relevant evidence.  See Bernal-Benitez, 594 F.3d at 1315.

> 2.    The Prosecutor's Other Statements Challenging Sosa's Testimony

In his rebuttal, the prosecutor argued that the testimony of other witnesses and the evidence admitted at trial discredited Sosa's testimony that Milian Martinez was the mastermind of the fraudulent scheme:

> The only evidence that Miguel Milian was [the mastermind] came from this man [Sosa].  That's the only evidence that Miguel Milian was the mastermind.  As I told you in my opening statement that Miguel Milian was bringing patients.  He didn't bring all the patients.  That Miguel Milian is a recruiter.
>
> [Sosa's] testimony [is that] Miguel Milian did everything.  That's just not true.  There is two ways. . . . One, you have to rely on his credibility.  I will get to that in a minute.  Miguel Milian was in charge[?]  He would make the money.  [But Sosa and Leon] split the money 50-50 like partners would. . . . Not Miguel Milian, less than $40,000. . . . Let's talk about credibility a little bit. Here's the instruction that the judge will give you on credibility.  You apply this to every witness you heard from. And this includes this man right here.  You treat him no different than any other witness.

Again, the prosecutor made it sufficiently clear that he was urging the jury to conclude that Sosa's testimony was not credible based on a consideration of the relevant evidence.  See id.  Once more, Sosa has failed to show any error.

31

## C.    Invoking Inflammatory and Improper Considerations

Sosa next contends that the government improperly exhorted the jury to return a guilty verdict on the basis of inflammatory and improper considerations. Specifically, Sosa contends that the prosecutor improperly (1) asked why a prosecutor would go to law school when he could make so much money by driving patients to a clinic; (2) referenced federal taxpayer money; (3) discussed health care fraud, mortgage fraud, and other types of fraud; and (4) told the jury that its duty was to return a guilty verdict.

During closing arguments, "a prosecutor must refrain from improper methods calculated to produce a wrongful conviction." United States v. Rodriguez, 765 F.2d 1546, 1559 (11th Cir. 1985). To that end, a prosecutor "is forbidden to make improper suggestions, insinuations and assertions calculated to mislead the jury and may not appeal to the jury's passion or prejudice." Id. at 1560 (quotation marks omitted and alteration adopted). Specifically, it is improper for a prosecutor to invoke the individual pecuniary interests of the jury as taxpayers. See United States v. Smyth, 556 F.2d 1179, 1185 (5th Cir. 1977).[7]

Here, once again, Sosa has failed to show that the district court plainly erred by allowing the prosecutor to make the statements that he claims improperly

---

[7]This Court adopted as binding precedent all Fifth Circuit decisions prior to October 1, 1981. Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

exhorted the jury to return a guilty verdict on the basis of inflammatory and improper considerations.

1.    The Prosecutor's Comment about Law School

During closing arguments, the government sought to convince the jury that Sosa and Leon knew that the payments made to Milian Martinez were for the referral of patients based on the size of the payments:

> These checks show [Milian Martinez was] paid for patients at their clinic.  Just for this transportation they paid him a total of $43,000 between May and August, $43,000 for bringing in patients[?]  Why did I go to law school if you could make $43,000 in two months, driving a handful of patients around? . . . If you analyze that, $43,000 in three months, that's over $160,000 a year [Milian Martinez] makes by bringing patients.  It's because he's referring to something valuable to these guys, Medicare patients.

Sosa has failed to explain how the prosecutor's statement regarding why he would go to law school if he could make $43,000 in two months by driving patients to the clinic was "calculated to mislead the jury" or "appeal to the jury's passion or prejudice." Rodriguez, 765 F.2d at 1560.  Rather, the prosecutor was merely pointing out that the large payments made to Milian Martinez indicated that Sosa and his co-defendant were obviously paying for more than transportation services.  Accordingly, Sosa has failed to show any error, let alone any plain error, as to this comment.

33

2.    The Prosecutor's Reference to Federal Taxpayer Money

The government further argued that, even if the jury did not think Sosa and Leon's payments to Milian Martinez were made for the purpose of committing fraud, the payments were nonetheless illegal because they were made for referrals of patients in connection with a federally funded health care program:

> Simply by paying someone to refer patients, that in and of itself is illegal.  This is federal taxpayer money.  That's part of what has been to be proved.  And we cannot pay for referrals or patients that are funded by federal money.  So even if you believe that all of the healthcare were given, all of those shots are given, it doesn't even matter, they still violate the law because they paid referrals for this.

Based on this record, Sosa has shown no error regarding the prosecutor's comment because he has failed to show that the statement was "calculated to mislead the jury" or "appeal to the jury's passion or prejudice," id., or that it was intended to invoke the individual pecuniary interests of the jury as taxpayers, Smyth, 556 F.2d at 1185.  Indeed, the context of the statement shows that the prosecutor referenced federal taxpayer money only in explaining that the kickbacks were paid in connection with services billed to a federal healthcare program, which is an element of the charged Anti-Kickback offenses.  See 42 U.S.C. § 1320a-7b(b)(2)(A).  Because the prosecutor's comment, when viewed in context, was not improper, Sosa has failed to show any error.

34

3.      The Prosecutor's Reference to Other Types of Fraud

The prosecutor discussed the allegations of fraud in this case and explained why the government sought <u>health care</u> fraud convictions against Sosa and Leon: "The defendant did all of this with delivery of or paid for healthcare services. That's what makes it healthcare fraud or mortgage fraud or any other kind of fraud. [It is] about services you never gave, medical services."

Sosa again has failed to show error regarding these statements because he has not shown that they were "insinuations [or] assertions calculated to mislead the jury" or "appeal to the jury's passion or prejudice." <u>Rodriguez</u>, 765 F.2d at 1560. Instead, the context of the prosecutor's statements suggests that he intended to explain why Sosa was charged with <u>health care</u> fraud, rather than some other type of fraud. Thus, Sosa has failed again to show any error.

4.      The Prosecutor Telling the Jury Its "Job" Was to "Put an End to This"

The government concluded its rebuttal by telling the jurors that it was their "job" to "[p]ut and end to this" fraud:

> All I'm going to end on is to say you use your reason and common sense. We spent a couple of days here. You've had a unique opportunity to see the inside of a very sad and sordid institution in South Florida. You got to see how this organization works.
>
> It's sad how it works. It's true. Blue Cross Blue Shield, they paid out $400,000. At least they stopped it after two months. Imagine what would happen i[f] it went on and on. It got stopped because at one point here

> Mary Tejada did her job.  She passed it over to the
> agents.  Once they did their job they sent it to me.  I did
> my job.  I indicted the case.  I tried to present the case as
> best as I could what happened.  And now it's your job.
> Put an end to this, ladies and gentlemen.  Put an end to
> this.

Sosa has not shown plain error regarding these statements.  Although it is improper for a prosecutor "to exhort the jury to 'do its job,'" United States v. Young, 470 U.S. 1, 18, 105 S. Ct. 1038, 1047 (1985), Sosa has failed to meet the heavy burden of plain-error review because "the record contains sufficient independent evidence of guilt" and any error was therefore harmless.  See Eckhardt, 466 F.3d at 947; see also Part II.

## IV. SOSA'S SENTENCE

On appeal, Sosa's final argument is that the district court erred by applying two increases to his base offense level when calculating Sosa's advisory guidelines range.  Specifically, Sosa contends that the district court erred in applying a three-level increase for a supervisory or managerial role, pursuant to U.S.S.G. § 3B1.1(b), and a two-level, sophisticated-means increase, pursuant to U.S.S.G. § 2B1.1(b)(10)(C).

We review for clear error both a district court's decision to impose an aggravating-role increase, United States v. Rodriguez De Varon, 175 F.3d 930, 937 (11th Cir. 1999), and its finding that the offense involved sophisticated means, pursuant to U.S.S.G. § 2B1.1(B)(10)(C), United States v. Ghertler, 605 F.3d 1256,

36

1267 (11th Cir. 2010). Under the deferential standard of clear-error review, "we will not disturb a district court's findings 'unless we are left with a definite and firm conviction that a mistake has been committed.'" United States v. Clarke, 562 F.3d 1158, 1165 (11th Cir. 2009) (quoting United States v. Crawford, 407 F.3d 1174, 1177 (11th Cir. 2005)).

## A.    Calculation of Sosa's Advisory Guidelines Range

Pursuant to U.S.S.G. § 2X1.1, Sosa's base offense level for conspiracy to commit health care fraud was taken from U.S.S.G. § 2B1.1, which covers violations under 18 U.S.C. § 1347. Sosa's conspiracy to commit health care fraud offense and his health care fraud offenses were grouped, pursuant to U.S.S.G. § 3D1.3. Under U.S.S.G. § 2Z1.1, Sosa's base offense level for conspiracy to pay health care kickbacks was taken from U.S.S.G. § 2B4.1, which addresses violations under 42 U.S.C. § 1320a-7b(b)(2)(A). Sosa's conspiracy to pay health care kickbacks offense and his payment of kickbacks offenses were grouped, pursuant to § 3D1.3. Because § 2B1.1 produced a higher offense level than § 2B4.1, Sosa's base offense level was six, pursuant to U.S.S.G. § 2B1.1(a)(2).

Sosa received a 16-level increase, pursuant to U.S.S.G. § 2B1.1(b)(1)(I), because the loss was more than $1,000,000 but not more than $2,500,000. He received a two-level increase, pursuant to U.S.S.G. § 2B1.1(b)(10)(C), because the offense involved sophisticated means. Sosa received a three-level increase,

37

pursuant to U.S.S.G. § 3B1.1(b), because he was a manager or supervisor, but not an organizer, of criminal activity that involved five or more participants or was otherwise extensive.  Sosa also received a two-level increase, pursuant to U.S.S.G. § 3C1.1, because he obstructed justice by lying at trial.  Sosa's total offense level was 29, which with his criminal history category of I, yielded an advisory guidelines range of 87 to 108 months.

The district court imposed a total sentence of 102 months.  Sosa received terms of 102 months' imprisonment each for his conspiracy to commit health care fraud offense and his eight substantive health care fraud offenses, and terms of 60 months' imprisonment each for his conspiracy to pay health care kickbacks offense and three offenses for substantive payment of kickbacks.  All of Sosa's sentences run concurrently.

On appeal, Sosa challenges only the increases for his role in the offenses and for use of sophisticated means in the fraud.

## B.    Managerial/Supervisory Increase

Under § 3B1.1(b), the three-level increase for a managerial or supervisory role applies if (1) the defendant was a manager or supervisor, but not an organizer or leader; and (2) the criminal activity involved five or more participants or was otherwise extensive.  U.S.S.G. § 3B1.1(b).  To qualify for the increase, the defendant need only manage or supervise one other participant in the criminal

activity. Id. § 3B1.1 cmt. n.2. However, "a section 3B1.1 enhancement cannot be based solely on a finding that a defendant managed the assets of a conspiracy," without the defendant also managing or exercising control over another participant. United States v. Glover, 179 F.3d 1300, 1303 (11th Cir. 1999). A participant "is a person who is criminally responsible for the commission of the offense, but need not have been convicted." Id. § 3B1.1 cmt. n.1.

"In assessing whether an organization is 'otherwise extensive,' all persons involved during the course of the entire offense are to be considered. Thus, a fraud that involved only three participants but used the unknowing services of many outsiders could be considered extensive." Id. § 3B1.1 cmt. n.3.

In this case, the evidence introduced at trial indicated that Sosa was a manager or supervisor of the criminal activity—the fraud realized through the operations of Discovery. Sosa also drove patients to and from the clinic, was repeatedly present at Discovery when recruited patients were there, and was identified by patient witnesses as being involved with Discovery. Furthermore, Leon and Sosa were partners, and Sosa ran Discovery when Leon was not there. Sosa split the proceeds of the fraud with Leon. As recounted earlier, Sosa received nearly $119,000, Leon received $119,000, and Milian Martinez received the considerably lesser total of $43,000. Finally, Sosa was an investor in Discovery, a signatory on Discovery's bank account for 75 days, had some decision-making

39

authority and control over Discovery's finances, and wrote checks to Milian Martinez to compensate him for his role in the fraud. Even if Sosa was a supervisor or manager only of Milian Martinez, that single underling is enough to qualify Sosa as a manager or supervisor under the Guidelines. Id. § 3B1.1 cmt. n.2.

The evidence also demonstrates that the fraud operated through Discovery was extensive. Testimony introduced at trial revealed how Sosa, Leon, and Milian Martinez actively participated and profited from the fraud. In addition, Discovery paid at least a dozen patients to come to the clinic and receive "services" as part of the fraud. And Discovery used an outside billing company to submit more than $1,000,000 in false Medicare Part C claims in just over three months. The scheme also involved the recruitment of patients, the falsification of medical records, and, as recounted, Sosa and Leon receiving tens of thousands of dollars from the fraud. In light of this evidence, and because "a fraud that involved only three participants but used the unknowing services of many outsiders could be considered extensive," id. § 3B1.1 cmt. n.3, the district court did not err in finding that the fraud was "otherwise extensive" under U.S.S.G. § 3B1.1(b).

At a minimum, the district court did not clearly err in applying the three-level increase for a managerial or supervisory role, pursuant to § 3B1.1(b).

## C.    Sophisticated Means Increase

Section 2B1.1(b)(10)(C) of the Sentencing Guidelines provides for a two-level increase if a fraud offense involved "sophisticated means."  U.S.S.G. § 2B1.1(b)(10)(C).  Sophisticated means are "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense."  U.S.S.G. § 2B1.1 cmt. n.8(B).  The Guidelines commentary identifies "[c]onduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts" as ordinarily indicating sophisticated means.  Id.  "There is no requirement that each of a defendant's individual actions be sophisticated in order to impose the enhancement.  Rather, it is sufficient if the totality of the scheme was sophisticated."  Ghertler, 605 F.3d at 1267.

In this case, the government introduced evidence that the fraud operated through Discovery included the hiring of a billing service, DNA, through which Discovery submitted more than $1,000,000 in false claims in just three months.  Furthermore, the evidence indicated that Discovery hired a doctor as part of the scheme, and paid about a dozen HIV-positive patients to come to the clinic to receive fraudulent "treatments."  And the patients were not paid directly, but in a surreptitious manner where someone would "take [the patients] to the side and slip [them] the money" they were promised.  Furthermore, Sosa noted on the checks he

41

wrote to Milian Martinez that the patient recruiter was being paid for transport, a further effort to conceal the true nature of the scheme.

Additionally, rather than simply submitting claims for treatments that were never given, Discovery actually injected the HIV-positive patients with vitamins and other inexpensive products and then billed Medicare for expensive injections and infusions. Finally, Sosa himself took a portion of his profits via payment to a company that he created but never actually operated. Specifically, Discovery wrote $30,000 in checks to Y&R Medical Center Group, a company owned by Sosa, rather than directly to Sosa, which evinced a further effort to conceal the fraud and Sosa's role in it.

Considering all this evidence regarding "the totality of the scheme," id., we are not left with "a definite and firm conviction that a mistake has been committed," Clarke, 562 F.3d at 1165. Accordingly, we conclude that the district court did not clearly err in applying the sophisticated-means increase. Id.

## V. CONCLUSION

For all the foregoing reasons, we affirm Sosa's convictions and sentence.

**AFFIRMED.**

42