[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 17-13545

_____

D.C. Docket No. 8:16-cr-00436-JSM-MAP-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

CORDERA HILL,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(August 1, 2018)

Before ED CARNES, Chief Judge, BRANCH, and FAY, Circuit Judges.

PER CURIAM:

This is a healthcare kickback case involving a pharmacy, a marketing

company, and a group of sales representatives nicknamed "Team Cream." The

pharmacy filled prescriptions for compounded creams, expensive medications covered by Tricare, a federal healthcare program.  The marketing company received 50% of the pharmacy's profit for every prescription filled as a result of its marketing efforts.  And Team Cream, a group of sales representatives that included defendant Cordera Hill, marketed the creams for the company.  A jury found Hill guilty for conspiring to violate the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, and for two substantive Anti-Kickback offenses because Hill and his fellow team members used cash payments to market the creams.  He appeals his convictions and sentence.

## I.     FACTS AND PROCEDURAL HISTORY

### A. Facts

### 1.  Centurion Compounding and Compounded Creams

Centurion Compounding was a marketing company based in Florida that promoted prescription medications called compounded creams.  A compounded cream is tailored to the needs of a specific patient.  For example, if a patient cannot tolerate a certain mass-produced prescription medication, a compounding pharmacist can combine different types of medications into a unique cream for that particular patient.  The compounded creams at issue in this case could be used to treat scars, pain, acne, and migraines.

2

In May 2014 LifeCare Pharmacy in St. Petersburg, Florida, entered into a referral agreement with Centurion in which Centurion would receive 50% of the insurance compensation LifeCare received (minus the cost of the prescription drugs) whenever Centurion's marketing efforts resulted in LifeCare filling a cream prescription for a patient.[1]  During the time relevant to this case, Tricare, a federally funded healthcare program for military members, covered compounded creams.  After a doctor wrote a prescription to a patient for a compounded cream and LifeCare filled the prescription, LifeCare would submit a claim to Tricare, which would pay the pharmacy for the cost of the prescription.  The cream prescriptions were not cheap:  Tricare's reimbursement rates ran from $2,000 for a tube of acne cream to $17,000 for a tube of scar cream.  Tricare paid an average of $6,000 to $8,000 for each cream prescription, and each prescription typically lasted 20 or 30 days.

## 2.  Centurion's Marketing Efforts

Centurion relied on tiers of sales representatives to promote the creams. Under that multilevel marketing system, a sales representative received a commission not only for each sale he made, but also received a percentage of the

---

[1] LifeCare sold its interest in the compounded prescriptions to Oldsmar Pharmacy in Palm Harbor, Florida, at the end of 2014, but the referral arrangement with Centurion remained the same.  For ease of reference throughout the opinion, we refer to the pharmacy filling the cream prescriptions as "LifeCare."

3

sales of each person he recruited to work beneath him, and so on down the chain. Centurion employed over 1,900 sales representatives.

One of Centurion's sales representatives was Erin Berry, a service member stationed at MacDill Air Force Base outside Tampa, Florida.  Berry received 20% of Centurion's profit for each cream prescription filled as a result of her marketing efforts, and she also recruited people to work under her as sales representatives. Berry's marketing group was called "Team Cream."

In October 2014 Berry recruited Hill, another service member stationed at MacDill, to work for Team Cream.[2]  Hill signed a Centurion marketing agreement under which he would receive 15% of Centurion's profit for each cream prescription that was filled as a result of his marketing efforts.  That agreement required Centurion representatives "to conduct all of [their] business activities and operations in conformity with all state, local and federal laws and regulations."  It further specified that:  "Marketing representative acknowledges that he/she has read and understands the requirements and limitations provided in Florida [Statute] § 817.505, attached hereto as Exhibit 'A.'"  That statute makes it unlawful to pay people "in cash or in kind" to "induce the referral of a patient or patronage to or from a health care provider" or solicit such a payment "in return for referring a patient or patronage to or from a health care provider."  Fla. Stat. § 817.505(1)(a)–

---

[2] Before Hill signed on with Team Cream, Berry had referred him to one of the clinics so that he could obtain his own prescription for a compounded cream.

(b).  In November 2014 Centurion sent Hill an email reminder about complying with § 817.505.  The subject line read "WE HAVE A NO TOLERANCE POLICY!" and the content stated that "[i]f it is brought to our attention, with proof, that a Marketing Representative is paying doctors or patients directly we WILL immediately terminate [the representative's] contract and anyone else involved.  See page 9 Exhibit A of your contract or read Florida [Statute] § 817.505."

   3.  Team Cream's Marketing Operation and the Group Text Message

After Hill signed his marketing agreement, he became part of Team Cream. It had 7 members counting Berry and Hill in November 2014, and by January 2015 it had grown to at least 11 members.  Team Cream promoted the creams by referring potential patients to several prescription "clinics" — one at a Mary Kay cosmetics store, one at a banquet room in a DoubleTree Hotel, and another at an urgent care clinic in Tampa.  Potential patients would complete prescription forms and then see a doctor at the site to obtain a cream prescription.  Team Cream members had unique identifying numbers, which appeared on the prescription form they gave to prospective patients, so that Centurion could track the number and type of prescriptions that each representative secured.

Berry used a group text message to communicate with Team Cream members.  Hill was part of that group text.  Between October 2014 and January

2015, Berry sent text messages to Team Cream members to encourage their sales efforts, update them on the team's progress, and hand out individual instructions. Here is an example of a typical motivational text:

> Good morning Team cream. Are you hungry? Are you motivated? Are you ready to be so successful that you don't have to introduce yourself because your work speaks for itself? I believe in each one of you. Today make it a point to meet one new person keep in mind that is one person closer to making you a millionaire.

Berry also sent messages almost every day about the "Tricare challenge," which referred to her goal of referring 50 to 100 Tricare patients to the clinics before January 1, 2015. For instance, she reminded the team that "[o]ur goal collective [sic] is 100 patients/[prescriptions] before [January] 1st. You need to be willing to do whatever it takes to make that happen. Fly patients in, networking, buying people lunch and talk about compounds even flirt if necessary."

Some of Berry's text messages mentioned Hill by name, and Hill also responded to some messages and used the group text to share news with the team members. For instance, Berry sent one message with 11 people for the team to target and listed Hill as the contact for 4 of those people. After Berry sent a motivational text to the team, Hill responded: "Thanks for the motivation. I am happy for each and everyone one [sic] of you and know that we will all be successful. Good night team." And when Berry sent a message asking the team members to congratulate a member for his sales efforts, Hill responded with a

"congrats." Finally, Hill also sent a message informing the team that one of the clinics was a "no go" because patients who visited that clinic would have to show scars and stretch marks to the doctor before receiving cream prescriptions.

### 4. Hill's Marketing Efforts and Recruitment of Anthonio Miller

Hill began to market the creams immediately after he became a member of Team Cream. He approached Anthonio Miller, a friend and service member stationed at MacDill Air Force Base, and asked Miller about a scar on his face. Hill said that he worked for a company that marketed prescription creams, and that Miller could get a cream that would help heal the scar. He also raised the possibility of Miller signing up as a sales representative for Centurion. Hill gave Miller the address for the Mary Kay cosmetics store clinic, and when Miller went to the clinic the next day Hill was there. Miller filled out a form, met with a doctor, and received a prescription for two creams.

After Miller visited the doctor, Hill put him in contact with Berry. Miller signed a Centurion marketing agreement and became a part of Team Cream. After Miller joined Team Cream, he began paying friends to visit the clinics. He sent Berry a text message telling her that he would have a few people coming to a clinic, that he would have "cash 40 in envelopes," and that he was "just trying to make my end by any means." Miller repeated that he would pay patients $40, and Berry suggested that he start at $25 or $30. Miller texted back that he had "500 in

7

a shoe box in all $20s" and was paying patients up front, to which Berry responded: "Just make sure they don't mention the money thing to the doctor or in the clinic." Berry added: "As I told [H]ill make sure the people you bring get as much as they can at least 3 or 4 things that way you get your money's worth my suggestion to you is scar cream." Miller responded that he was selling scar cream, that he had some potential patients, and that the "money thing [was] the last resort."

After Miller began working as a sales representative, Hill remained in contact with him. Miller sent one of his friends, Rashad Barr, to a clinic for a cream prescription and encouraged Barr to bring other people to the clinics. Miller told Barr that he would pay him $40 for each prospective patient and give $60 to the patient. When Barr arrived at a clinic one day with some prospective patients, Miller could not pay all of them. Berry and Hill were also at the clinic, and Miller told the two of them that he had extra patients but could not pay them and that they could have the patients if they wanted them. Miller testified that Hill and Berry understood what he meant when he referred to paying Barr and the patients.[3] After Miller left, Hill and Berry remained in the parking lot with Barr's patients, although Miller never saw Hill pay them. Miller eventually began paying some

---

[3] Barr also posted the following message on a social media account: "If you at Macdill and you want to make a [sic] easy $50 [hit me up] right now." Berry texted Hill and Miller and told them that "[t]his needs to be fixed ASAP bad for business," and Miller replied "Done."

patients $100 each, and Hill met with him to ask why Miller was increasing his payments.

Hill, like Miller, also paid patients to visit the clinics and used Barr to drum up business. Ahdina Mayweather, Hill's girlfriend, testified that Hill told her that he was paying Barr and another friend to recruit potential patients. She recounted an interaction that she saw between Hill and Barr in a clinic parking lot in which Hill met Barr and two other men, the two men left, and then Hill gave some money to Barr. And she testified that Hill told her that he was upset with a friend of his, Marcus Bates, because he had to pay Bates to visit a clinic.

Miller and Hill were not the only members of Team Cream who paid patients to visit the clinics for cream prescriptions. Nikkos Hamlett, a military pharmaceutical technician at MacDill, was referred to a clinic by a Team Cream member. Hamlett then signed a marketing agreement, became a representative, and began paying patients to visit the clinics. He testified that he paid 20 or 25 patients $50 or $100 each to visit the clinics and that he knew Tricare was reimbursing LifeCare for the prescriptions. Hamlett also testified that Berry held a team meeting, which Hill attended, where Berry discussed different ways to recruit patients. Berry mentioned flying patients in, as well as making cash payments, and told the attendees not to tell anybody about the cash payments.

9

### 5.  Hill Reimburses Two Friends for Travel Costs

Hill also paid two people to fly into Tampa so that they could obtain cream prescriptions.  In December 2014 he told Mayweather that he would fly her best friend, Gina Mitchell, in from Hawaii as a Christmas present.  Mayweather paid for Mitchell's $785 ticket, and Hill gave Mayweather $600 to help cover the cost of that ticket.  Hill knew that Mitchell was in the military but had never met her before.  After she arrived, the three hung out at Hill's house and Hill asked Mitchell whether she had any medical problems, such as skin conditions, scars, or migraines.  Even though Mitchell never said she was not feeling well, Hill told her that she should see a doctor.  Mitchell agreed, and within a few days the three of them visited one of the cream clinics.  Mitchell received a prescription for some creams, but the pharmacist could not ship them to Hawaii, so Mayweather provided the address of another friend.  Tricare paid $28,043.48 for Mitchell's creams.  Berry sent a text message to Team Cream recognizing Hill for "taking the next step by flying [in] a patient."

That same month Hill also paid for Brennae Bloom, an ex-girlfriend and another service member, to visit him in Tampa.  Bloom paid for the flight on her own credit card after Hill promised to reimburse her.  After she landed the two went to a gas station and then headed straight to a clinic.  Bloom saw a doctor, who prescribed her creams for pain and stretch marks.  Hill and Bloom then went to

10

dinner, after which Hill stopped at an ATM, withdrew some money, and paid Bloom $400 for the plane ticket. The two went to a bar and spent the night at a hotel, and then Bloom left town; she did not spend two full days in Tampa. She testified that she would not have visited Tampa unless her plane ticket had been paid for. When she received the creams, she found that they did not work and she threw them away. Tricare paid $24,591.14 for those creams.

As a result of Hill's marketing efforts, 20 patients obtained cream prescriptions that were submitted to Tricare and reimbursed. Including the prescriptions that Hill obtained for himself, Tricare was billed a total of $954,692.05 as a result of Hill's conduct and it reimbursed LifeCare for $813,584.22.

## B. Procedural History

In April 2017 Hill was charged in a superseding indictment on one count for conspiracy to violate 42 U.S.C. § 1320a-7b and two counts for substantive Anti-Kickback violations.[4] The Anti-Kickback Statute makes it a criminal offense if a person:

---

[4] Hill, Miller, and Barr were charged as co-defendants in the original indictment on one count of conspiracy and nine substantive Anti-Kickback violations (two for Hill, three for Miller, and four for Barr). Pursuant to a plea agreement, Miller pleaded guilty to count one, the remaining counts against him were dismissed, and he testified at Hill's trial. He received five years probation. Barr's case was closed and he entered into a pretrial diversion program. Hamlett was indicted in a different case and pleaded guilty to one substantive Anti-Kickback violation; he received five years probation and testified against Hill pursuant to his plea agreement. The record is not clear whether Berry was charged, but she died before Hill's trial.

knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person —
(A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or
(B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program.

42 U.S.C. § 1320a-7b(b)(2)(A)–(B).

The conspiracy count charged Hill with violating subsections (A) and (B) and 18 U.S.C. § 371[5] based on Team Cream's payments to induce Tricare beneficiaries to visit the clinics for cream prescriptions.  Hill was also charged on two counts of paying remunerations to induce Mitchell and Bloom to visit the clinics for cream prescriptions, in violation of 42 U.S.C. § 1320a-7b(b)(2)(B).

The case was tried to a jury for three days in April 2017.  After the government presented its case-in-chief, Hill moved for judgment of acquittal on all counts, which the court denied.  He rested without presenting any evidence.  The jury found him guilty on all three counts.  The court sentenced him to 24 months imprisonment, and he is currently released pending appeal.

---

[5] That statute provides that if "two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both." 18 U.S.C. § 371.

12

## II.    DISCUSSION

Hill challenges his convictions and sentence.  He contends that the district court erred in admitting Berry's text messages and that there was insufficient evidence to support his convictions.  And he contends that the district court miscalculated his guidelines range.

### A. Admissibility of the Text Messages

Hill argues that the district court abused its discretion in admitting Berry's text messages as co-conspirator statements because there was not enough evidence, apart from the text messages, to show that she was a co-conspirator.

Statements made by a "party's coconspirator during and in furtherance of the conspiracy" are not hearsay.  Fed. R. Evid. 801(d)(2)(E).  A co-conspirator's statement is admissible under that rule if the government shows "by a preponderance of the evidence that:  (1) a conspiracy existed; (2) the defendant and the declarant were members of the conspiracy; and (3) the statement was made during the course and in furtherance of the conspiracy."  United States v. Hough, 803 F.3d 1181, 1193 (11th Cir. 2015).  To determine the statement's admissibility, the district court "may consider both the co-conspirator's out-of-court statement and evidence independent of it," but the statement alone does not establish "the existence of the conspiracy or participation in it."  Id. (quotation marks omitted).

13

There was sufficient evidence apart from Berry's text messages to establish that she was a co-conspirator. Berry recruited Hill to join Team Cream, and after Hill joined the team he referred Miller to Berry so that Miller could join. Miller testified that he spoke with Berry and Hill outside of a clinic at one point about how he had extra patients and could not pay them, and that Berry and Hill could take the patients if they wanted the sales commissions. And Hamlett testified that Berry held a Team Cream meeting attended by several members, including Hill, in which she discussed various ways to recruit more patients. All of that evidence shows that Berry was not only part of the Team Cream conspiracy, but also its leader, which means that the district court did not abuse its discretion in admitting the text messages under Rule 801(d)(2)(E).[6]

## B. Sufficiency of the Evidence

Hill next contends that the evidence was insufficient to convict him of conspiracy to pay healthcare kickbacks (count one) and the payment of kickbacks to Bloom and Mitchell (counts two and three). We review de novo the sufficiency of the evidence, viewing it "in the light most favorable to the jury's verdict, and

---

[6] Hill makes a one-sentence argument that the messages were highly prejudicial and that their admission deprived him of his rights to due process and a fair trial. He provides no support for that passing argument, which means that it is abandoned. See Sapuppo v. Allstate Floridian Ins. Co., 739 F.3d 678, 681 (11th Cir. 2014) ("[S]imply stating that an issue exists, without further argument or discussion, constitutes abandonment of that issue and precludes our considering the issue on appeal.") (quotation marks omitted). Hill also notes that Berry died before the trial began and could not be cross-examined, but the admissibility of co-conspirator statements does not depend on the declarant's availability. See Fed. R. Evid. 801(d)(2)(E).

14

accept[ing] reasonable inferences and credibility choices by the fact-finder."

United States v. Quilca-Carpio, 118 F.3d 719, 720 (11th Cir. 1997) (quotation

marks omitted).  "We uphold the conviction if a reasonable trier of fact could find

that the evidence establishes the defendant's guilt beyond a reasonable doubt."  Id.

### 1.  Conspiracy Conviction

"For a defendant to be found guilty of conspiracy, the government must

prove beyond a reasonable doubt (1) that a conspiracy existed; (2) that the

defendant knew of it; and (3) that the defendant, with knowledge, voluntarily

joined it."  United States v. Sosa, 777 F.3d 1279, 1290 (11th Cir. 2015).  Hill does

not contest that a conspiracy existed insofar as Team Cream members were paying

kickbacks to prospective patients.  But he does deny that he knowingly and

voluntarily joined that conspiracy.  He argues that he was essentially an unwitting

pawn in Berry's scheme and did not know that kickbacks were being paid to

potential patients.

That argument fails because there was more than enough evidence for a

reasonable juror to find that Hill knowingly and voluntarily joined the Team

Cream conspiracy.  As for the knowledge requirement, plenty of evidence showed

that Hill understood the "essential nature" of the conspiracy — that Team Cream

members were paying kickbacks to potential patients.  Id. (quotation marks

omitted).  Miller testified that he told Berry and Hill that he was paying patients

15

and was paying Barr to refer patients; according to Miller, Berry and Hill understood that arrangement. Miller also testified that Hill confronted him at one point about why Miller was increasing his payments to potential patients. Mayweather, Hill's girlfriend, testified that Hill was upset because he had to pay a friend to visit a clinic. Finally, Hamlett testified that Berry called a team meeting, which Hill and other team members attended, where Berry mentioned making cash payments and telling the members to keep such payments quiet. That evidence was more than enough for a reasonable juror to conclude that Hill knew that Team Cream members were paying kickbacks to potential patients. See id. ("[A] defendant can be convicted of conspiracy if the evidence demonstrates that he was aware of the conspiracy's essential nature, even if he did not know all of its details, played only a minor role in the overall scheme, did not have direct contact with other alleged co-conspirators, or did not participate in every stage of the conspiracy.").[7]

There was also more than enough evidence for a reasonable juror to find that Hill voluntarily joined the conspiracy by taking multiple steps to help Team Cream achieve its goal of signing more patients, often by paying kickbacks. See id.

---

[7] Hill cites our decision in United States v. Medina, 485 F.3d 1291, 1298 (11th Cir. 2007), in which we stated that paying kickbacks is not enough "to establish health care fraud without someone making a knowing false or fraudulent representation to Medicare." But that case provides no support for him because Hill was not convicted of healthcare fraud, and we confirmed in Medina that kickbacks do violate § 1320a-7b(b)(2). Id.

16

(stating that the government can satisfy its burden on this element "through proof of surrounding circumstances such as acts committed by the defendant which furthered the purpose of the conspiracy") (quotation marks omitted).  He signed a Centurion marketing agreement under which he received a 15% sales commission.  After joining Team Cream, he was part of Berry's group text message in which Berry often referred to the group as "Team cream."  And, as stated above, Hill recruited Miller to join the team, who in turn paid patients to visit the clinics and paid Barr to refer patients.  Hill also flew Mitchell and Bloom into Tampa so that he could take them to the clinics.  Because all of those acts show that he voluntarily joined the conspiracy, see id., there is sufficient evidence to sustain the conspiracy conviction.

## 2.  Substantive Convictions

The jury also found Hill guilty on two substantive Anti-Kickback counts under § 1320a-7b(b)(2)(B) based on his payments to Mitchell and Bloom.  He argues that the payments he made to them were not designed to induce them to purchase the creams, and that he did not knowingly and willfully violate the Anti-Kickback statute.[8]  Those arguments fail.

---

[8] He also argues that there is no evidence that he paid kickbacks to the other patients he recruited, but he was charged and convicted for the substantive violations based only on his payments to Mitchell and Bloom, so whether he paid kickbacks to anyone else is irrelevant.

17

A reasonable juror could find that Hill paid Mitchell and Bloom to induce them to travel to Tampa so that they could visit the clinics. Hill argues that the clinic visits were only an "incidental feature" of their trips, but the evidence shows otherwise. Mayweather testified that Hill gave her $600 so that she could fly Mitchell into Tampa, and the night Mitchell arrived Hill began asking questions about her health problems and recommended that she see a doctor, even though he had never met her. Mitchell agreed, and within a few days of her arrival Hill took her to one of the clinics so that she could obtain cream prescriptions. The evidence about Bloom was even stronger: Hill said that he would pay for her flight, and right after she landed they went to a clinic so that she could obtain cream prescriptions. After leaving the clinic, Hill went to an ATM, withdrew some money, and paid Bloom $400 for her plane ticket. And she testified that she visited him only because he paid for her flight. That evidence was sufficient for a reasonable juror to conclude that Hill paid Mitchell and Bloom, at least in part, to induce them to visit the clinics and obtain cream prescriptions.[9]

---

[9] It is unclear if Hill is arguing that § 1320a-7b(b)(2)(B)'s inducement element prohibits a conviction where the evidence shows that part of the reason the defendant paid a person was to induce them to purchase an item paid for by a federal healthcare program, even if the defendant had other motives (for instance, Hill paid Bloom to visit Tampa not only so that she would visit a clinic, but also because he wanted to see his ex-girlfriend). In any event, that argument fails because the inducement element covers that mixed-motive situation. See Inducement, Black's Law Dictionary (10th ed. 2014) ("The act or process of enticing or persuading another person to take a certain course of action."). As Hill's counsel admitted during closing argument, "the law does state, that if the remuneration has another purpose, if at least one purpose of the payment is to induce referrals, then the statute has been violated."

18

As for § 1320a-7b(b)(2)(B)'s knowledge and willfulness requirement, there is sufficient evidence to show that Hill acted "voluntarily and purposely, with the specific intent to do something the law forbids, that is with a bad purpose, either to disobey or disregard the law." Sosa, 777 F.3d at 1293 (quotation marks omitted). His Centurion marketing agreement required him to acknowledge that he read and understood Florida Statute § 817.505, which (like the federal Anti-Kickback Statute) makes it unlawful to pay people to induce the referral of a patient to a healthcare provider. In November 2014, the month before he paid Mitchell and Bloom, Centurion sent Hill an email reminding him about the company's "no tolerance policy" about paying patients. Hamlett testified that Berry held a meeting which Hill attended where she warned that making cash payments to patients should be kept quiet, indicating that such payments were illicit. All of that evidence shows that Hill knew that paying patients to visit the clinics was unlawful. See id. ("[T]he giving or taking of kickbacks for medical referrals is hardly the sort of activity a person might expect to be legal.") (quotation marks omitted). As a result, there was sufficient evidence for a reasonable juror to find that Hill knowingly and willfully violated § 1320a-7b(b)(2).

## C. Sentencing Challenge

Hill contends that the district court erred in calculating his guidelines range. The presentence investigation report (PSR) calculated Hill's offense level under

United States Sentencing Guidelines § 2B4.1, which governs "Bribery in Procurement of Bank Loan and Other Commercial Bribery." Neither Hill nor the government objects to the PSR's use of § 2B4.1 to calculate his offense level. See United States v. Valladares, 544 F.3d 1257, 1266 (11th Cir. 2008) (affirming the district court's use of § 2B4.1 to calculate the defendant's offense level in a Medicare fraud case involving violations of § 1320a-7b).

Section 2B4.1(b)(1)(B) provides that if "the greater of the value of the bribe or the improper benefit to be conferred . . . exceed[s] $6,500," then the defendant's offense level must be increased "by the number of levels from the table in § 2B1.1 . . . corresponding to that amount." U.S.S.G. § 2B4.1(b)(1)(B) (Nov. 2016). The PSR calculated the value of the improper benefit received as $954,692.05, which was the sum of $98,570.12 (the amount Tricare was billed for Hill's personal prescriptions) and $856,121.93 (the amount Tricare was billed for patients Hill recruited and received or was promised to receive sales commissions). That amount led the district court to impose a 14-level enhancement to Hill's base offense level. See id. § 2B1.1(b)(1) (providing for a 14-level increase where the loss is more than $550,000 and less than $1,500,000). Neither Hill nor the government objected to that amount at the sentence hearing. The district court calculated Hill's total offense level as 20 and his criminal history as category 1, which resulted in a guidelines range of 33 to 41 months. It imposed a 24-month

20

sentence on all three counts, running concurrently, and three years of supervised release.

Hill argues that the district court improperly calculated the amount of the improper benefit conferred as the intended loss from the scheme ($954,692.05), instead of just the net benefit conferred to Centurion as a result of the kickback payments (Hill does not provide an alternate number for the net benefit). He concedes that we review this challenge for plain error because he did not make that argument before the district court.[10] Under plain error review, we cannot correct an error "unless there is: (1) error, (2) that is plain, and (3) that affects substantial rights." United States v. Rodriguez, 398 F.3d 1291, 1298 (11th Cir. 2005) (quotation marks omitted). If those conditions are satisfied, we "may then exercise [our] discretion to notice [the] forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." Id. (quotation marks omitted).

The district court plainly erred in calculating the improper benefit conferred as $954,692.05, which was the potential loss to the government as a result of the scheme, instead of calculating the net value of the benefit Centurion expected to

---

[10] The government argues that Hill invited any error because he referred to the "intended loss" in his objections to the PSR, but that reference is not clear enough to trigger the invited error rule because he also referred to the "value of the bribe or improper benefit." See United States v. Hayes, 762 F.3d 1300, 1310 n.6 (11th Cir. 2014) ("[T]he invited error doctrine is not triggered by ambiguous statements or representations.").

21

receive from the scheme.  Section 2B4.1 requires courts to calculate the "improper benefit to be conferred."  U.S.S.G. § 2B4.1(b)(1).  That phrase means the "value of the action to be taken or effected in return for the bribe."  Id. cmt. n.2.  We have interpreted that phrase to mean the "net value" of the benefit.  United States v. DeVegter, 439 F.3d 1299, 1303 (11th Cir. 2006) (quotation marks omitted); see also United States v. Cohen, 171 F.3d 796, 803 (3d Cir. 1999) ("'[I]mproper benefit' refers to the net value accruing to the entity on whose behalf the individual paid the bribe.  Other courts agree.") (citing cases from the Fourth, Fifth, and Eighth Circuits).  For example, if a defendant's kickbacks induce a company to purchase $10,000,000 worth of goods from the defendant's employer, and the employer receives a $700,000 profit on those goods, then $700,000 is the amount of the improper benefit.[11]  Cohen, 171 F.3d at 803–04; see also United States v. Landers, 68 F.3d 882, 883–84 (5th Cir. 1995) (concluding that the phrase "improper benefit conferred" refers to the "gross value of the contracts [awarded as a result of the kickbacks] minus all direct costs associated with performing the contracts").

---

[11] The background to § 2B4.1 provides another example:  "If a gambler paid a player $5,000 to shave points in a nationally televised basketball game, the value of the action to the gambler would be the amount that he and his confederates won or stood to gain."  Id. § 2B4.1 cmt. background.  The commentary to § 2B4.1 also cross-references the commentary to § 2C1.1, which governs bribery of public officials, and provides yet another example of the "net value" of a benefit:  "A $150,000 contract on which $20,000 profit was made was awarded in return for a bribe; the value of the benefit received is $20,000."  U.S.S.G. § 2C1.1 cmt. n.3.

22

Instead of calculating the net value of the benefit conferred to Centurion as a result of Hill's kickbacks, the district court used $954,692.05, the total amount of insurance claims submitted to Tricare. That amount is wrong for two reasons. First, Tricare did not reimburse LifeCare for that entire amount; it paid out only $813,584.22 ($84,674.40 for Hill's personal prescriptions and $728,909.82 for the prescriptions from patients Hill unlawfully recruited). So the government actually lost $813,584.22, not $954,692.05, as a result of Hill's kickbacks. Second, Centurion could not expect to receive that full $813,584.22 in Tricare reimbursements. Under Centurion's referral agreement with LifeCare, Centurion received only 50% of LifeCare's profit from the creams. Even if we assume that the creams cost LifeCare nothing (which is unlikely), Centurion could expect to receive, at most, $406,792.11 (half of $813,584.22). See Cohen, 171 F.3d at 804 ("'To be conferred' . . . could include any benefit that the briber expected to receive at the time he paid the bribe, even if he did not ultimately receive it."). Using $406,792.11 as the improper benefit conferred, Hill should have received only a 12-level enhancement. U.S.S.G. § 2B1.1(b)(1).[12] That would have led to a

---

[12] Hill argues that the district court should not have taken into account the claims Tricare reimbursed for Hill's own prescriptions ($84,674.40), because those claims did not result from kickbacks Hill paid to other people. Even if that amount is subtracted from $406,792.11, the resulting improper benefit of $322,117.71 would still yield a 12-level enhancement. See U.S.S.G. § 2B1.1(b)(1) (providing for a 12-level enhancement where the improper benefit is more than $250,000).

total offense level of 18 and a guidelines range of 27 to 33 months imprisonment, not 33 to 41 months.

The district court's improper calculation of Hill's guidelines range amounted to plain error. See United States v. Prieto, 232 F.3d 816, 823 (11th Cir. 2000) ("For [an error] to be 'plain,' [it] must . . . have been clear under the law at the time the error was made."). The third prong is satisfied because that plain error created a "reasonable probability of a different result." Rodriguez, 398 F.3d at 1299; see Molina-Martinez v. United States, 578 U.S. __, 136 S. Ct. 1338, 1346 (2016) ("In most cases a defendant who has shown that the district court mistakenly deemed applicable an incorrect, higher Guidelines range has demonstrated a reasonable probability of a different outcome."). And as the Supreme Court recently held, "in the ordinary case . . . the failure to correct a plain Guidelines error that affects a defendant's substantial rights will seriously affect the fairness, integrity, and public reputation of judicial proceedings," which means that the fourth prong is satisfied.[13] Rosales-Mireles v. United States, 585 U.S. __, 138 S. Ct. 1897, 1911 (2018).

---

[13] We have concluded that a remand is unnecessary where the district court erroneously calculates the guidelines, but imposes a reasonable sentence and states that it would impose the same sentence regardless of the guidelines. United States v. Keene, 470 F.3d 1347, 1348–50 (11th Cir. 2006). But we don't know whether the district court would have imposed the same 24-month sentence had the guidelines been 27 to 33 months.

24

For those reasons, we vacate Hill's sentence and remand for resentencing based on the correct definition of "improper benefit conferred." We leave open for the district court in the first instance any and all issues about relevant conduct.[14]

### III.  CONCLUSION

We **AFFIRM** Hill's convictions, **VACATE** his sentence, and **REMAND** for resentencing.

---

[14] Hill also challenges his sentence as substantively unreasonable, but we need not address that argument in light of our decision to remand for recalculation of the proper guidelines range. The government suggests that Hill's co-conspirators' conduct may be relevant at resentencing, and asks that the district court be free to consider such conduct in fashioning a new sentence. "[W]e have often held that a general vacatur of a sentence by default allows for resentencing de novo." United States v. Martinez, 606 F.3d 1303, 1304 (11th Cir. 2010). As a result, the government may introduce additional evidence, and the district court may fashion an entirely new sentence. See id. ("[W]e have had occasion to observe that when a criminal sentence is vacated, it becomes void in its entirety; the sentence — including any enhancements — has been wholly nullified and the slate wiped clean.") (quotation marks omitted).