[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 16-17006
_____

D.C. Docket No. 0:16-cr-60007-WJZ-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

MAURICE EXAVIER,

Defendant-Appellant.

_____

No. 16-17009
_____

D.C. Docket No. 0:16-cr-60007-WJZ-2

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

CARLINE MAURICE,

Defendant-Appellant.

_____

Appeals from the United States District Court
for the Southern District of Florida
_____

(July 30, 2019)

Before WILLIAM PRYOR, NEWSOM, Circuit Judges, and VRATIL,[*] District
Judge.

VRATIL, District Judge:

After a 10-day trial on a 22-count indictment, a jury found Maurice Exavier

and Carline Maurice guilty of conspiracy to commit wire fraud in violation of

18 U.S.C. §§ 1343 and 1349 (Count 1), conspiracy to commit identity fraud in

violation of 18 U.S.C. §§ 1028(f) and 1028(a)(7) (Count 2), 15 counts of wire fraud

under 18 U.S.C. § 1343 (Counts 3-17), and five counts of aggravated identity theft

under 18 U.S.C. § 1028A (Counts 18-22).  The jury acquitted Jimmy Alexandre on

all counts.  The district court sentenced Exavier to 145 months in prison and Maurice

to 132 months in prison.

On appeal, Exavier and Maurice argue that (1) the evidence was insufficient

to support their convictions and (2) a new trial is warranted because the

government failed to disclose certain information and presented false testimony.

_____

[*]Honorable Kathryn H. Vratil, United States District Judge for the District of Kansas, sitting by
designation.

2

Exavier individually argues that the district court erred because it (1) refused to give a jury instruction on multiple conspiracies, (2) admitted evidence of another crime under Rule 404(b) of the Federal Rules of Evidence, and (3) imposed various sentencing enhancements.  Maurice individually argues that the district court erred when it refused to sever her trial from Exavier's trial.  For reasons stated below, we affirm.

## I.  BACKGROUND

Exavier and Maurice were principals of Broward Financial Services, LLC ("BFS"), Advance Tax and Accounting Services, Inc. ("ATAS"), and Advance Tax and Accounting Services 2 ("ATAS2").  All three companies provided tax preparation services.  Alexandre worked as a tax preparer for a separate business called "Mr. Cash and Associates" ("Mr. Cash").  The government alleges that through these businesses, defendants arranged to file false tax returns on behalf of deceased individuals and have refund checks deposited into bank accounts that Exavier and Maurice controlled.

To facilitate electronic filing, the Internal Revenue Service ("IRS") assigns individual tax preparers a Preparer Tax Identification Number ("PTIN").  Similarly, the IRS assigns tax preparation businesses an Electronic Filing Identification Number ("EFIN").  Both the EFIN and PTIN are specific to that business or individual, and cannot be transferred or reassigned.  When a tax

3

preparation business files an electronic return, it must include both the EFIN for the business and the PTIN for the individual tax preparer.

In 2003, the IRS issued an EFIN to BFS. In March of 2008, the IRS issued a PTIN to Exavier so that he could file tax returns for BFS clients. In 2009, in addition to tax preparation services, BFS obtained a state license as a money services business to offer check cashing services for tax preparation clients. The EFIN for BFS became inactive in November of 2010, and the IRS suspended its authorization to file tax returns electronically.

In July of 2010, Exavier and Maurice established ATAS, with Maurice as president and Exavier as vice president. The IRS issued an EFIN to ATAS.

On September 10, 2010, a Florida corporation called The Tax Doctors of Broward County reorganized to become ATAS2, with the same business address as ATAS. On September 30, 2010, the IRS issued an EFIN to ATAS2.

In early 2011, ATAS electronically filed 158 income tax returns seeking $536,430 in refunds for deceased individuals. In this same period, ATAS2 electronically filed 312 returns for deceased individuals claiming $1,069,752 in refunds. All of these refunds were filed under EFINs for ATAS and ATAS2 and Maurice's PTIN. Each return included the correct name, birth date, and social security number of the decedent, but listed false information regarding employment, income, contact information, tax credits, deductions, and dependents.

4

The IRS did not actually owe refunds on any of these returns.

In transactions involving a paid tax preparer, a taxpayer can direct the IRS to deposit the refund in the bank account of a designated third party. The third party pays the tax preparer directly, then deducts a processing fee and pays the balance to the taxpayer. ATAS and ATAS2 used Santa Barbara Tax Products Group ("SBTPG") to process refunds and pay tax preparation fees. SBTPG sent blank checks to ATAS and ATAS2 and when it received refunds from the IRS, authorized them to print cashier's checks for the taxpayers. The government claimed that defendants used this arrangement so that Maurice and Exavier could deposit refund checks for deceased individuals into accounts which they controlled.

On January 19, 2011, after reviewing nine tax returns that had been filed for deceased individuals under the ATAS EFIN, SBTPG terminated its relationship with ATAS. Other than a few refund checks that issued before it discovered the fraud, SBTPG did not actually issue refunds for the fraudulent returns that ATAS and ATAS2 had filed. SBTPG did deposit tax preparation fees into their bank accounts, however, with ATAS receiving approximately $54,457 and ATAS2 receiving $245,569. Of the $54,457 which ATAS received, $4,000 was traced to Maurice and $2,000 to Exavier, with the balance largely used to pay "1099 commissions" to various unspecified individuals. Of the $245,569 which

ATAS2 received, $10,000 was transferred to Maurice through checks, $59,000 was transferred to Exavier through checks, $5,000 was transferred to a BFS bank account, and nine checks totaling $20,350 were made payable to cash. The balance apparently remained in the ATAS2 account or was not directly traceable to defendants.

Alexandre worked as a tax preparer for Mr. Cash in early 2011. He received permission from the company's owner, Yanel Laroche, to file electronic tax returns for his "friends," *i.e.*, tax preparers who had lost their EFINs but who nevertheless wished to service some 1,000 clients. Between January 28 and March 3, 2011, Alexandre filed 363 tax returns electronically under Mr. Cash's EFIN and his own PTIN. Of those 363 tax returns, 345 sought refunds amounting to $1,708,910 in the names of deceased individuals. Like the fraudulent returns which ATAS and ATAS2 filed, Alexandre's returns contained the correct names, birth dates, and social security numbers of the decedents, but listed false information regarding employment, income, contact information, tax credits, deductions, and dependents.

For Alexandre's returns, Mr. Cash used SBTPG to process refunds and pay tax preparation fees. In March of 2011, SBTPG contacted Laroche to alert him that tax returns had been filed for "dead people" under Mr. Cash's EFIN. Laroche discovered that Alexandre had prepared all of those tax returns. When SBTPG detected the fraud, it had already authorized checks for many of the refunds

6

claimed in those returns. Among them, SBTPG had authorized $555,939 in refunds on 161 checks that were printed in the Mr. Cash office and deposited into a BFS business checking account that listed Exavier and Maurice as authorized signatories. Alexandre, who did not have a physical office at Mr. Cash, was the only individual who had picked up refund checks that SBTPG issued for the fraudulent returns. SBTPG paid $965,585 in refunds that the IRS funded for the 345 fraudulent tax returns that Alexandre prepared in early 2011.

Approximately 97 percent of the checks deposited into the BFS business checking account in the first quarter of 2011 were tax refund checks. At trial, IRS Special Agent Bradley Cohen testified that in addition to the 161 refund checks related to Alexandre's returns, BFS deposits included 491 refund checks totaling $1,785,683 from returns filed by tax preparers other than defendants, ATAS, ATAS2, or Mr. Cash. Of this amount, $639,610 was transferred to another BFS account which listed Maurice and Exavier as signatories. From that account, checks totaling $57,250 were paid to Maurice, $40,500 to Exavier, $19,000 to Exavier's wife, $4,000 to ATAS, and $360,298 to cash. Of the checks made payable to cash, $28,000 was traced to a joint account that belonged to Exavier and his wife. Agent Cohen did not opine on the legitimacy of all of the refund checks from other tax preparers, but he analyzed 100 of the 491 refunds. He found that more than 60 of the refund checks were for deceased individuals and that 18 of

7

them were for incarcerated individuals, two of whom were serving life terms.

Agent Cohen testified that documents from the Office of Financial Regulation had listed BFS as a check cashing and money transmitter business. Agent Cohen testified that in November of 2009, when Exavier applied for a Florida business license, he represented that his check cashing operation was limited to cashing checks for tax clients. Agent Cohen testified that in February of 2012, when he went to visit the principal place of business which BFS listed on its annual report, he did not see any sign which represented that check cashing services were offered there. Agent Cohen testified that from 2010 through 2016, BFS moved several times to and from the most recent address on record with the State of Florida (2033 University Drive, Sunrise, Florida) and where ATAS and ATAS2 were located (930 and 938 N.E. 62 Street, Oakland Park, Florida).

Agent Cohen further testified that some checks on the bank account of Exavier and his wife had been made payable to "Antonio Duval." Other checks drawn on a BFS account were payable to the same individual. Agent Cohen never investigated Duval and did not know how much cash he received from Exavier.

Exavier did not testify at trial. Through counsel, he maintained that he had a legitimate check cashing operation and that perhaps a teller, Duval, or someone else had cooperated with Alexandre in the fraudulent scheme. Exavier's counsel argued that the government's investigation was incomplete because it did not

sufficiently investigate the signatures on various documents, the actual sender or recipient of various email communications, or the unidentified recipients of large amounts of money from refund checks and tax preparation fees.

Maurice also did not testify. Through counsel, she suggested that someone had forged her signature, established bank accounts in her name, and used her PTIN without her knowledge. A handwriting expert testified that "she didn't write the signature on certain of the documents that were submitted" and that as to other documents, his findings were "inconclusive." The expert eliminated Maurice as the signatory on three documents, including two checks, but he could not eliminate her as the person who signed the remaining documents.

At trial, Alexandre testified that he had met a man named "Crazy C," who told him that he and his partners had a tax return preparation business with more than 1,000 clients, but that the business had lost its EFIN. In return for part of the tax preparation fees, Crazy C gave Alexandre information on his clients so that Alexandre could prepare their tax returns for 2010. Alexandre testified that Laroche gave him permission to file the returns through Mr. Cash. Alexandre accepted tax return files from Crazy C and filed the returns electronically under Mr. Cash's EFIN. Alexandre claimed that when he accepted tax returns from Crazy C, he did not know they were for deceased individuals. Alexandre testified that he had no intent to defraud anyone and that he had not conspired with Exavier

or Maurice to file fraudulent tax returns.  Alexandre testified that he had no idea how tax refund checks ended up in BFS bank accounts because he had simply picked up the checks at Mr. Cash's offices and given them to Crazy C.

## II.  DISCUSSION

### A.    Sufficiency Of The Evidence (Both Defendants)

Exavier and Maurice argue that the evidence was insufficient to support their convictions for conspiracy to commit wire fraud (Count 1); conspiracy to commit identity fraud (Count 2); wire fraud (Counts 3-17); and aggravated identity theft (Counts 18-22).  Both defendants sought judgment of acquittal under Rule 29 at the close of the government's case and at the close of all the evidence.  The district court denied the motions.  After trial, Maurice filed a renewed motion for judgment of acquittal based on the sufficiency of the evidence.  The district court denied the motion.

We review de novo the denial of a Rule 29 motion for judgment of acquittal. *United States v. Chafin*, 808 F.3d 1263, 1268 (11th Cir. 2015).  We will uphold the district court's denial of a motion for judgment of acquittal "unless no reasonable trier of fact could find guilt beyond a reasonable doubt." *Id.* (quoting *United States v. Farley*, 607 F.3d 1294, 1333 (11th Cir. 2010)).  We view the evidence in the light most favorable to the government, resolving all reasonable inferences and credibility determinations in favor of the guilty verdict. *Id.*  "It is not necessary for

the government to disprove every reasonable hypothesis of innocence, as a jury is free to choose among reasonable constructions of the evidence." *United States v. Foster*, 878 F.3d 1297, 1304 (11th Cir. 2018) (citation and internal quotation marks omitted). Because credibility determinations are the "exclusive province of the jury," we "assume that the jury made all credibility choices in support of the verdict." *United States v. Croteau*, 819 F.3d 1293, 1304–05 (11th Cir. 2016) (citations and internal quotation marks omitted).

Exavier argues that the evidence was insufficient to support his convictions because the government did not show that he had direct contact with Maurice or Alexandre, he raised alternate grounds of innocence, and the circumstantial evidence which tied defendants together was not substantial. Maurice argues that the evidence was insufficient to support her convictions because the government presented "no evidence that [she] knew [Alexandre], no evidence that [she] signed any fraudulent check [or] tax return[,] or that she was involved in the setting up of the systems or entity used to commit the fraud."

### 1.    *Substantive Counts Of Wire Fraud And Aggravated Identity Theft*

As to the substantive counts, Counts 3-17, defendants do not dispute that the trial evidence established wire fraud. *See United States v. Ward*, 486 F.3d 1212, 1221–22 (11th Cir. 2007) (wire fraud requires proof that defendant (1) intentionally participated in scheme to defraud and (2) used or caused use of

the wires for purpose of executing that scheme).  Defendants only dispute whether the government offered sufficient proof that they participated in the scheme, which we analyze below collectively with the sufficiency of the evidence on the conspiracy convictions.

Likewise, as to the substantive counts of aggravated identity theft, Counts 18-22, defendants do not dispute that someone committed aggravated identity theft.  *See United States v. Presendieu*, 880 F.3d 1228, 1240 (11th Cir. 2018) (aggravated identity theft requires proof that defendant "(1) knowingly transferred, possessed, or used; (2) the means of identification of another person; (3) without lawful authority; (4) during and in relation to a felony enumerated in [18 U.S.C.] § 1028A(c)" (citation and internal quotation marks omitted)); *see also* 18 U.S.C. § 1028(d)(7)(A) ("social security number" is "means of identification"); 18 U.S.C. § 1028A(c)(5) (wire fraud is enumerated felony in Section 1028A(c)). Again, defendants only challenge whether the government proved that they participated in the filing of the fraudulent tax returns, which we analyze below collectively with the evidence of conspiracy.

2.    *Conspiracy To Commit Wire Fraud And Aggravated Identity Theft*

To establish conspiracy to commit wire fraud (Count 1), the government must prove that (1) two or more persons agreed to commit wire fraud, (2) the defendant knew of the unlawful agreement, and (3) the defendant knowingly and

12

voluntarily joined the agreement. *United States v. Martin*, 803 F.3d 581, 588 (11th Cir. 2015). To establish conspiracy to commit identity fraud (Count 2), the government must prove that (1) two or more persons agreed to commit fraud in connection with identity documents, (2) the defendant knew of the agreement, and (3) the defendant knowingly and voluntarily joined the agreement. *See id.* (noting general elements of conspiracy as applied to wire fraud); 18 U.S.C. § 1028(f) (penalty for attempt and conspiracy to commit fraud in connection with identification documents and authentication features).

As to the first element of conspiracy, *i.e.*, the agreement, "[d]irect evidence . . . is unnecessary." *United States v. Hano*, 922 F.3d 1272, 1294 (11th Cir. 2019) (citation and internal quotation marks omitted). "Indeed, because the crime of conspiracy is predominantly mental in composition, it is frequently necessary to resort to circumstantial evidence to prove its elements." *Id.* at 1294–95 (citation and internal quotation marks omitted).

As to the second element of conspiracy, *i.e.*, defendant's knowledge of the agreement, "the government need not prove that the defendant knew all of the details or participated in every aspect of the conspiracy." *United States v. Sosa*, 777 F.3d 1279, 1290 (11th Cir. 2015) (citation and internal quotation marks omitted). "Rather, the government must only prove that the defendant knew the essential nature of the conspiracy." *Id.* (citation and internal quotation marks

omitted).

As to final element of conspiracy, *i.e.*, defendant's knowing and voluntary participation, "the government can meet this burden through proof of surrounding circumstances such as acts committed by the defendant which furthered the purpose of the conspiracy." *Id.* (citation and internal quotation marks omitted). "The government need not prove that a defendant participated in every stage of the conspiracy or had direct contact with each of the other alleged co-conspirators." *United States v. Reeves*, 742 F.3d 487, 498 (11th Cir. 2014).

The government presented only circumstantial evidence that Exavier and Maurice participated in the conspiracies and committed the substantive offenses. Even so, a reasonable jury could have found them guilty beyond a reasonable doubt. Bank records, paperwork filed with Florida Division of Corporations, and various IRS applications identify Exavier and Maurice as the principals of BFS, ATAS, and ATAS2. Email communications to and from Exavier's email account demonstrated that Exavier and Maurice both participated in the operation of ATAS and ATAS2, and established a connection between Exavier and Alexandre. In early 2011, hundreds of fraudulent income tax returns were filed electronically for deceased individuals under the EFINs of ATAS and ATAS2 and the PTIN for Maurice. For these returns, ATAS and ATAS2 together received approximately $300,000 in tax preparation fees from SBPTG. For the same tax season,

14

Alexandre, who also used SBPTG, filed hundreds of fraudulent income tax returns for deceased individuals and picked up the refund checks for those returns. While Alexandre testified that he gave the checks to Crazy C, a reasonable jury could have found that Alexandre or someone at his direction deposited the checks totaling $555,939 into a BFS account that Exavier and Maurice controlled. The government traced only part of the money, but Exavier and Maurice controlled the funds and checks payable to Exavier, his wife, Maurice, ATAS and "CASH" withdrew thousands of dollars from BFS bank accounts. Because Exavier and Maurice personally profited from the fraud, a reasonable jury could have found that each of them intended to participate in that fraud. *See United States v. Bradley*, 644 F.3d 1213, 1239 (11th Cir. 2011).

Exavier and Maurice presented alternate hypotheses of innocence. Even so, after resolving all reasonable inferences in favor of the guilty verdict, a reasonable jury could have found them guilty beyond a reasonable doubt on all counts. *See Chafin*, 808 F.3d at 1268. Accordingly, the district court did not err in overruling defendants' motions for judgment of acquittal.

B.    *New Trial Based On Prosecutorial Misconduct (Both Defendants)*

Maurice argues that she was entitled to a new trial because the government withheld evidence favorable to her defense. Exavier argues that he was entitled to a new trial because the government presented false testimony at trial.

15

Allegations of prosecutorial misconduct present mixed questions of fact and law that are ordinarily subject to de novo review. *United States v. Campa*, 529 F.3d 980, 992 (11th Cir. 2008). Neither defendant raised claims of prosecutorial misconduct below, however, so we review for plain error. *United States v. Horner*, 853 F.3d 1201, 1206 (11th Cir. 2017).

In *Brady v. Maryland*, 373 U.S. 83 (1963), the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment." *Id.* at 87. To obtain a new trial under *Brady*, a defendant must show that (1) the government possessed evidence favorable to defendant; (2) defendant did not possess that evidence and could not have possessed it with due diligence; (3) the government suppressed the evidence; and (4) had the evidence been disclosed to defendant, a reasonable probability exists of a different outcome at trial. *United States v. Vallejo*, 297 F.3d 1154, 1164 (11th Cir. 2002).

In *Giglio v. United States*, 405 U.S. 150 (1972), the Supreme Court extended the due process protections in *Brady* to include disclosure of evidence that is relevant to the credibility of a prosecution witness. *Id.* at 154–55; *see id.* at 153 ("deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with 'rudimentary demands of justice'" (citation omitted)). To prevail on a claim under *Giglio*, a defendant must establish that

16

"(1) the prosecutor knowingly used perjured testimony or failed to correct what he subsequently learned was false testimony; and (2) such use was material *i.e.*, that there is any reasonable likelihood that the false testimony could have affected the judgment." *United States v. Stein*, 846 F.3d 1135, 1147 (11th Cir. 2017) (citation and internal quotation marks omitted). As to the first element, "the suggestion that a statement may have been false is simply insufficient; the defendant must conclusively show that the statement was actually false." *Maharaj v. Sec'y for Dep't of Corr.*, 432 F.3d 1292, 1313 (11th Cir. 2005). As to the materiality element, a new trial is required "unless the prosecution persuades the court that the false testimony was harmless beyond a reasonable doubt." *Stein*, 846 F.3d at 1147 (quoting *Guzman v. Sec'y, Dep't of Corr.*, 663 F.3d 1336, 1348 (11th Cir. 2011)).

### 1.    *Failure To Disclose Favorable Evidence (Maurice)*

Maurice argues that she was entitled to a new trial under *Giglio* because the government withheld evidence that Exavier had possession of her PTIN. Because Maurice asserts that the government withheld evidence, not that the government presented false testimony, we construe her argument as asserting a *Brady* violation.

At sentencing, Agent Cohen testified that he recalled seeing information about Maurice's PTIN in search warrant records of Exavier's emails. Maurice argues that by withholding this information until sentencing, the government prevented her from arguing at trial that Exavier could have used her PTIN without

17

her knowledge.  Maurice does not dispute that before trial, the government disclosed all of its exhibits — including Exavier's emails.  Accordingly, she cannot establish that she did not possess or that the government suppressed this information.  In addition, she has not shown that if the evidence had been presented to the jury, a different trial outcome was reasonably probable.

Maurice has not shown plain error based on any prosecutorial misconduct.

2.    *Presentation Of False Testimony (Exavier)*

a. *Agent Cohen Testimony About Location Of Check Asking Store*

Exavier argues that the government presented false testimony from Agent Cohen about whether BFS advertised check cashing services to the public.  Agent Cohen testified that in November of 2009, in his application for a Florida business license, Exavier represented that he only cashed checks for tax clients.  Agent Cohen further testified that in February of 2012, he did not see any sign at 2033 North University Drive, Sunrise, Florida which represented that check cashing services were offered there.

Exavier argues that Agent Cohen's testimony was false because it implied that "BFS had no advertised check cashing business and therefore no actual check cashing business."  Exavier argues that the government and Agent Cohen knew that (1) BFS did not operate its check cashing services at the Sunrise location and (2) in 2011, one year before Agent Cohen visited the Sunrise location, BFS had

18

opened a check cashing store at 930 N.E. 62nd Street, Oakland Park, Florida.

Exavier concludes that Agent Cohen falsely testified that "his photographs in

Government Exhibit 31 actually depicted the entire business of BFS, including the

existence or non-existence of any check cashing operation" and that "his

photographs of the Sunrise location accurately depicted the storefront of BFS with

regard to whether a check cashing business existed." Agent Cohen's testimony,

however, was not quite so broad. Agent Cohen testified that "at that location" in

Sunrise, BFS had no signage for check cashing services. Agent Cohen's testimony

potentially could be considered misleading if in February of 2012, BFS did in fact

advertise check cashing services at other locations, but Exavier has not shown that

BFS did so or that the government knew of this fact.[1] Accordingly, he has not

shown that Agent Cohen's testimony was actually false. *See Maharaj*, 432 F.3d at

1313 (under *Giglio*, suggestion that statement may have been false is insufficient;

defendant must "conclusively" show that statement was actually false).

---

[1]    The trial record included evidence that on October 15, 2010, BFS amended its license application as a money services business to reflect that its main address was 930 N.E. 62nd Street. On February 5, 2011, however, BFS filed an annual report with the Florida Secretary of State that reflected its "principal place of business" was the Sunrise location. On March 23, 2011, BFS amended its annual report to reflect a change from its "current principal place of business" at the Sunrise location to its "new principal place of business" at an Oakland Park location. Less than one month later, on April 18, 2011, BFS again amended its annual report to reflect that it was changing its principal place of business back to the Sunrise location. Norma Mendoza, a friend and tax client of Maurice, testified that since 2011, a sign for "check cashing" was displayed over the storefront at 930 N.E. 62nd Street, Oakland Park without a specific business name. The above evidence does not establish that in February of 2012, when Agent Cohen took the picture of the Sunrise location, BFS in fact advertised itself at the Oakland Park location as a "check cashing" operation.

        *b.*      *Leonie Pascoe Testimony About Meaning Of "MSB" Account*

Leonie Pascoe, a Bank of America personal banker who had helped Exavier and Maurice open accounts for BFS, ATAS, and ATAS2, testified that BFS's "MSB" account stood for "merchant services" account. Exavier argues that Pascoe's testimony was false because the "MSB" account stood for a "Money Service Business" account that check cashing businesses are required to maintain. Exavier notes that state regulations and financial institution policies require that a business have an MSB ("Money Service Business") account and that banks often close accounts of customers who conduct check cashing business from a regular account.

Pascoe's testimony appears to be false because the Bank of America signature cards and related documents reflect that the reference to an MSB account is to a "Money Service Business" account. Even though Pascoe's testimony was mistaken, however, it was "harmless beyond a reasonable doubt." *Stein*, 846 F.3d at 1147 (quoting *Guzman*, 663 F.3d at 1348). Exavier argues that if the jury had known that BFS had a legitimate "Money Service Business" account, it may have concluded that Exavier ran a legitimate check cashing operation. As the government notes, however, the arcana of banking requirements about MSB accounts was not related to any element of the offense and no other evidence was presented on the topic. Based on Pascoe's vague and limited reference to MSB

accounts, the absence of any further evidence on the issue except some limited references in a voluminous exhibit, and the fact that the distinction between a merchant services account and a money service business account was not at issue at trial, we find that that Pascoe's testimony was harmless beyond a reasonable doubt.

### c.    Agent Cohen Testimony About Ability To Trace Checks

Agent Cohen testified that Alexandre electronically filed 345 tax returns and that 161 of the refund checks (totaling $550,939) could be traced to a BFS bank account. Exavier argues that through this testimony, the government improperly represented that it could not trace the remaining 184 refund checks. Exavier maintains that this representation is incorrect because Steven Curry, an SBTPG representative, testified that the cancelled checks which his clearinghouse bank gave the government contained "the identities of the endorsers and deposit[o]rs along with the routing numbers and account numbers." In fact, Curry testified only that the checks "should" have contained such information. As Agent Cohen explained, the check copies which he received from SBPTG included checks that "did not have any data on the back" and others that had "illegible" data. Exavier has not satisfied his burden to show that Agent Cohen's testimony was false. *See Maharaj*, 432 F.3d at 1313.

In summary, Exavier has not shown that the government presented

21

materially false testimony.

## C.    *Motion To Sever (Maurice Only)*

Maurice argues that the district court erred in denying her motion to sever and her subsequent motion for new trial.  We review for abuse of discretion. *United States v. Browne*, 505 F.3d 1229, 1268 (11th Cir. 2007).

Because the indictment alleges that Maurice, Exavier, and Alexandre conspired to commit wire fraud and identity fraud, joinder was proper.  *See id.* Rule 14(a), Fed. R. Crim. P., provides that "[i]f the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires."  A new trial due to a refusal to grant severance before trial, or to grant a mistrial once trial has commenced, is not warranted unless defendant demonstrates that (1) the joint trial prejudiced him or her and (2) severance was the proper remedy for that prejudice.  *See Zafiro v. United States*, 506 U.S. 534, 538–41 (1993); *United States v. Blankenship*, 382 F.3d 1110, 1122 (11th Cir. 2004).  We are reluctant to reverse a district court's refusal to sever, particularly in conspiracy cases.  *Browne*, 505 F.3d at 1268.

The fact that defendants present antagonistic or mutually exclusive defenses is not per se prejudicial.  *Zafiro*, 506 U.S. at 538; *see United States v. Hill*, 643

F.3d 807, 834 (11th Cir. 2011).  A defendant does not suffer prejudice "simply because one co-defendant's defense directly inculpates another, or it is logically impossible for a jury to believe both co-defendants' defenses."  *Blankenship*, 382 F.3d at 1125.

Even if defendants can establish some prejudice, the district court has discretion to formulate an appropriate remedy.  *Zafiro*, 506 U.S. at 538–39.  "[I]t is well settled that defendants are not entitled to severance merely because they may have a better chance of acquittal in separate trials."  *Id.* at 540; *see also United States v. Morales*, 868 F.2d 1562, 1572 (11th Cir. 1989) (joint trial necessarily prejudicial to some degree).  The Supreme Court has noted that severance is the proper remedy in limited circumstances, *i.e.*, circumstances in which there is a serious risk that a joint trial would either "compromise a specific trial right of one of the defendants" or "prevent the jury from making a reliable judgment about guilt or innocence."  *Zafiro*, 506 U.S. at 539.

Before trial, Maurice filed a motion to sever which argued that (1) she could not jointly act with the co-defendants because she had "never met on any level one or more of h[e]r co-defendants" and (2) the documents were so voluminous and complex that it would be difficult for the jury to separate the evidence as to each defendant.  The district court summarily denied defendant's motion.  Maurice also filed a motion for new trial which asserted that the district court should have

granted severance because after Alexandre testified, the jury drew an adverse inference from her failure to testify. The district court again summarily denied her motion.

On appeal, Maurice asserts that the district court should have granted severance because (1) Exavier's defense that he and Maurice operated a legitimate business was irreconcilable with her defense that Exavier forged her signature, established bank accounts in her name, and used her PTIN and (2) based on Alexandre's testimony, in order for the jury "to believe the testimony of either defendant, it [had to] necessarily disbelieve the testimony, or lack thereof, of the other."

As to Exavier's defense, Maurice argues that a joint trial "constrained . . . her ability to exonerate herself" without implicating Exavier. Maurice apparently chose not to testify because she believed that her testimony would incriminate Exavier. Even so, this fact does not establish that the joint trial prejudiced her. As explained above, mutually exclusive or irreconcilable defenses are not per se prejudicial. *Zafiro*, 506 U.S. at 538; *see Hill*, 643 F.3d at 834; *see also Blankenship*, 382 F.3d at 1122 n.23 (*Zafiro* "implicitly overrule[d]" pre-*Zafiro* precedent to the extent that it required severance in the case of mutually exclusive defenses). Here, far from antagonistic, Exavier's defense that he ran legitimate businesses implied that Maurice also acted lawfully. At trial, Maurice knowingly

24

and voluntarily waived her right to testify.  She nevertheless was able to present her defense that Exavier had forged her signature on a number of documents and used her PTIN.  Maurice has not shown that Exavier's defense compromised "a specific trial right" or "prevent[ed] the jury from making a reliable judgment about guilt or innocence."  *Zafiro*, 506 U.S. at 539.

The district court explained that "the case of each defendant should be considered separately and individually" and that the jury's decision "to find any one or more of the defendants guilty or not guilty of any of the offenses charged should not affect [its] verdict as to any other offense or any other defendant."  Such instructions "ordinarily will mitigate the potential 'spillover effect' of evidence of a co-defendant's guilt."  *United States v. Kennard*, 472 F.3d 851, 859 (11th Cir. 2006).  Moreover, the fact that the jury acquitted Alexandre suggests that it conscientiously sifted through the evidence and made individualized determinations as to each defendant.  *See United States v. Diaz*, 248 F.3d 1065, 1101 (11th Cir. 2001) ("jury's ability to reach different verdicts as to different defendants is one factor that signifies the jury's ability to make individualized determinations").

Next, Maurice asserts that severance was required after Alexandre testified that he was honest and demonstrated that trait by testifying.  In her motion for new trial, Maurice essentially recognized that an additional instruction cautioning

25

against an adverse inference from a defendant's failure to testify would have reduced the potential prejudice of Alexandre's testimony.  We likewise find that a jury instruction would have been a proper remedy for any prejudice.  Accordingly, Maurice has not shown that severance was necessary.  *See United States v. Lopez*, 649 F.3d 1222, 1234 (11th Cir. 2011) (defendant must show that severance was "the only proper remedy" such that "jury instructions or some other remedy short of severance w[ould] not work").[2]

The district court did not abuse its discretion in denying Maurice's motion to sever and failing to order a new trial on the issue of severance.

D.    *Refusal To Give Requested Jury Instruction (Exavier Only)*

Exavier argues that the trial court erred because it refused to give an instruction on multiple conspiracies.  We review for abuse of discretion.  *United States v. McQueen*, 727 F.3d 1144, 1154 (11th Cir. 2013).  We will reverse a district court's refusal to give a requested jury instruction only "if the proffered

---

[2]    Although Maurice has not directly challenged the district court's failure to instruct further on defendant's failure to testify, the district court did not err in this regard.  The jury instructions adequately advised that each defendant "has a right not to testify," "[t]he law does not require a defendant to prove innocence or to produce any evidence at all," and "if a defendant elects not to testify, [the jury] cannot consider that in any way during . . . deliberations."  Moreover, Maurice has not identified any remarks by Alexandre or his counsel that directly commented on her failure to testify.  *See United States v. Hodges*, 502 F.2d 586, 587 (5th Cir. 1974) ("A mere favorable comment upon the fact that one of several co-defendants testified does not involve the same potential for prejudice as an adverse comment by counsel upon the failure to testify of the other co-defendant."); *see also Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc) (adopting as binding precedent all decisions of former Fifth Circuit handed down prior to October 1, 1981).

26

instruction was substantially correct, the requested instruction was not addressed in charges actually given, and failure to give the instruction seriously impaired the defendant's ability to present an effective defense." *United States v. Moore*, 525 F.3d 1033, 1046 (11th Cir. 2008) (quoting *United States v. Maduno*, 40 F.3d 1212, 1215 (11th Cir. 1994)).

Exavier argues that the evidence supports a finding of multiple conspiracies. Agent Cohen testified that BFS bank deposits included refunds for at least 60 tax returns for dead people or prison inmates that were filed by tax preparers other than defendants or their companies. Exavier argues that based on this testimony and other evidence, the jury could have found him guilty of some conspiracy not charged in the indictment, such as a conspiracy with other individuals in his companies; a conspiracy with Crazy C; or a conspiracy revealed by the checks that did not involve Alexandre.

An instruction on multiple conspiracies is warranted "when the indictment charges several defendants with one overall conspiracy, but the proof at trial indicates a jury could reasonably conclude that some of the defendants were involved only in separate conspiracies unrelated to the overall conspiracy charged in the indictment." *United States v. Chastain*, 198 F.3d 1338, 1350 (11th Cir. 1999). A single conspiracy is shown "[i]f a defendant's actions facilitated the endeavors of other coconspirators or facilitated the venture as a whole." *United*

*States v. Edouard*, 485 F.3d 1324, 1347 (11th Cir. 2007) (citation, internal quotation marks, and alternation omitted).  "It is irrelevant that particular conspirators may not have known other conspirators or participated in every stage of the conspiracy; all that the government must prove . . . is an agreement or common purpose to violate the law and intentional joining in this goal by the coconspirators."  *United States v. Alred*, 144 F.3d 1405, 1415 (11th Cir. 1998).  "[T]he finding of a single conspiracy is permitted where a key man directs and coordinates the activities and individual efforts of various combinations of people."  *Edouard*, 485 F.3d at 1347 (citation and internal quotation marks omitted).  "A single conspiracy does not become many simply because of the changing composition of the personnel comprising the conspiracy or because some members performed only a single function."  *United States v. Meester*, 762 F.2d 867, 880 (11th Cir. 1985).

Here, the jury could not find that Exavier was involved *only* in a separate conspiracy *unrelated* to the overall conspiracy charged in the indictment.  *Chastain*, 198 F.3d at 1350.  The fact that BFS deposits included refund checks from tax preparers not mentioned in the indictment does not show that the single overarching conspiracy was in fact multiple conspiracies and nothing more.  Counts 1 and 2 charge that the named defendants conspired "with each other and with others known and unknown to the Grand Jury."  The indictment does not

preclude a finding that Crazy C or additional individuals associated with Exavier's companies also participated in the charged conspiracy. As explained above, a single conspiracy does not become multiple conspiracies simply because some conspirators do not participate at every stage or perform every function. *See Edouard*, 485 F.3d at 1347.

Exavier's argument that the jury may have convicted him based solely on an uncharged conspiracy is also refuted by the verdict as to Maurice. The jury found Exavier and Maurice guilty of the same conspiracies in Counts 1 and 2, the same 15 substantive counts of wire fraud, and the same five counts of aggravated identity theft related to the means of identification used on tax returns set forth in the wire fraud counts. Based on the jury verdict, Exavier cannot plausibly argue that the jury found him guilty on the two conspiracy counts based solely on some uncharged and unrelated conspiracy.

In any event, Exavier has not shown that the district court's refusal to give an instruction on multiple conspiracies impaired his ability to present an effective defense. *See Moore*, 525 F.3d at 1046. The district court's instructions required the jury to find each element of the charged conspiracy including that Exavier agreed to "try to accomplish a common and unlawful plan" to commit wire fraud and identity fraud. In closing, Exavier's counsel argued that he had not participated in the charged conspiracies and that the government failed to show

29

that he had sent email messages referencing Maurice and Alexandre. The absence of an instruction on multiple conspiracies did not significantly impair this defense.

The district court did not abuse its discretion when it declined to give Exavier's proffered jury instruction on multiple conspiracies.

E.      *Admission Of Evidence Of Other Crimes (Exavier Only)*

Exavier argues that in violation of Federal Rule of Evidence 404(b), the trial court improperly admitted evidence of another crime. We review for abuse of discretion. *Edouard*, 485 F.3d at 1343.

At trial, Agent Cohen testified that in early 2011, 491 refund checks from tax preparers other than defendants, Mr. Cash, ATAS, or ATAS2 were deposited into a BFS bank account, and "a lot" of them were for deceased people and "some" were for prisoners.

Exavier's only objection was to Agent Cohen's testimony that one prisoner ("N.B.") was serving a life sentence. Exavier did not object to (1) the admission of N.B.'s tax return (which reflects that it was filed under Alexandre's PTIN and Mr. Cash's name and EFIN) or (2) Agent Cohen's initial testimony that the 491 refund checks included "a lot" of deceased people and "some" prisoners.

Exavier nonetheless argued that evidence that N.B. was serving a life sentence involved a collateral crime under Rule 404(b) and the prosecution had no evidence that any of the 491 files were attributed to any of the named defendants.

30

The government argued that the evidence was intrinsic to the crimes charged. The district court summarily overruled Exavier's objection.

Rule 404(b) provides that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). "The admissibility of evidence of uncharged conduct depends on whether the evidence is extrinsic or intrinsic to the charged offense." *United States v. Shabazz*, 887 F.3d 1204, 1216 (11th Cir. 2018). "If the evidence is (1) an uncharged offense which arose out of the same transaction or series of transactions as the charged offenses, (2) necessary to complete the story of the crime, or (3) inextricably intertwined with the evidence regarding the charged offenses, then it is admissible as intrinsic evidence as long as it satisfies the requirements of Rule 403." *Id.* (citation and internal quotation marks omitted).

In overruling Exavier's objection to Agent Cohen's testimony about N.B. serving a life sentence, the district court did not address whether the evidence was intrinsic to the charged conspiracies. Even so, such evidence was intrinsic because it related to an "uncharged offense which arose out of the same transaction or series of transactions as the charged offenses" and was "inextricably intertwined with the evidence regarding the charged offenses." *Id.* N.B.'s tax return (1) listed the employer, "Dillard Park Day Care Center," that deceased taxpayers reported on

31

Alexandre's tax returns; (2) generated a refund check that went into the BFS bank account in the same way as other refund checks identified in the indictment; and (3) reflects that Alexandre filed it through his PTIN and Mr. Cash's name and EFIN. Rule 404(b) did not bar Agent Cohen's testimony about N.B. being a prisoner serving a life sentence.[3]

Exavier argues that even if Agent Cohen's testimony about N.B. was intrinsic, the government was required to provide notice of its intent to introduce such evidence.  Because Rule 404(b) does not apply to intrinsic evidence, its notice requirement does not apply to such evidence.  *United States v. Church*, 955 F.2d 688, 700 (11th Cir. 1992) ("because the evidence is intrinsic, not extrinsic, we do not engage in a Rule 404(b) analysis").

Even if Exavier could establish that the district court erred in admitting Agent Cohen's testimony about N.B., any arguable error was harmless in light of the cumulative nature of the evidence and the other overwhelming evidence against Exavier.  *See United States v. Lane*, 474 U.S. 438, 450 (1986) (introduction of

---

[3]    Intrinsic evidence is still subject to Rule 403.  *United States v. Dixon*, 901 F.3d 1322, 1345 (11th Cir. 2018), *cert. denied sub nom. Portela v. United States*, 139 S. Ct. 854 (2019), and *cert. denied sub nom. Chacon v. United States*, 139 S. Ct. 1392 (2019).  Under Rule 403, a district court has the discretion to "exclude relevant evidence if its probative value is substantially outweighed by a danger" of "unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  Fed. R. Evid. 403.  Because Exavier does not challenge the admissibility of Agent Cohen's testimony about N.B. under Rule 403, we do not address it.

evidence resulting from misjoinder of one count of indictment was harmless). Exavier did not object to Agent Cohen's prior testimony that refund checks were deposited into BFS's account for some 18 prisoners including two prisoners serving life terms. Agent Cohen's further testimony that N.B.'s return was an example of a prisoner serving a life term "had no substantial influence on the outcome" and other overwhelming evidence supports the verdict. *United States v. Fortenberry*, 971 F.2d 717, 722 (11th Cir. 1992).

Defendant has not shown that the district court abused its discretion in admitting Agent Cohen's testimony about N.B. being a prisoner serving a life sentence.

F.     *Sentencing (Exavier Only)*

Exavier argues that at sentencing, the district court erred when it applied (1) a two-level enhancement under U.S.S.G. § 2B1.1(b)(2)(A)(i) because the offense conduct involved ten or more victims, (2) a two-level enhancement under U.S.S.G. § 2B1.1(b)(10)(C) because he engaged in unlawful conduct involving sophisticated means, and (3) a two-level enhancement under U.S.S.G. § 2Bl.l(b)(11)(A)(ii) because he possessed or used an authentication feature.

"When a defendant challenges one of the factual bases of his sentence, the government must prove the disputed fact by a preponderance of the evidence." *United States v. Aguilar-Ibarra*, 740 F.3d 587, 592 (11th Cir. 2014). We review

33

the district court's factual findings for clear error. *Shabazz*, 887 F.3d at 1222. "Although review for clear error is deferential, a finding of fact must be supported by substantial evidence." *United States v. Rodriguez*, 732 F.3d 1299, 1305 (11th Cir. 2013) (quoting *United States v. Robertson*, 493 F.3d 1322, 1330 (11th Cir. 2007)). We review de novo the district court's application of the Sentencing Guidelines to the facts. *Shabazz*, 887 F.3d at 1222.

### 1.      Enhancement For Ten Or More Victims

The district court enhanced Exavier's sentence two levels under U.S.S.G. § 2B1.1(b)(2)(A)(i) because the fraudulent scheme involved 10 or more victims. In doing so, the district court found that deceased individuals who were identified on tax returns were victims of the scheme.

For offenses involving fraud, the Guidelines provide a two-level enhancement if the offense involves "10 or more victims." U.S.S.G. § 2B1.1(b)(2)(A)(i). A "victim" includes "any person who sustained any part of the actual loss" attributed to the crime. *Id.*, cmt. n.1. In cases involving means of identification, "victim" also includes "any individual whose means of identification was used unlawfully or without authority." *Id.*, cmt. n.4(E). To qualify as a victim, the means of identification used must be of "an actual (*i.e.*, not fictitious) individual." *Id.*, cmt. n.1.

Exavier argues that the only victim was the United States and that because

34

he "knew the individuals were deceased at the time of the offenses," they should be excluded as victims.  In *United States v. Philidor*, 717 F.3d 883 (11th Cir. 2013), we rejected a similar argument.  In *Philidor*, relying on the plain meaning of "i.e." as an abbreviation for "that is," we reasoned that the exclusive definition in Application Note 1 to Section 2B1.1 for an "actual" individual is "not fictitious." *Id.* at 886.  We concluded that because the term "actual" does not distinguish between living and deceased persons, the district court is not required to find that the individuals were living before applying an enhancement based on the number of victims under Section 2B1.1(b)(2)(C).  *Id.*

The district court did not err in finding that Exavier's offense involved at least 10 victims.

### 2.    *Enhancement For Sophisticated Means*

The district court enhanced Exavier's sentence two levels under U.S.S.G. § 2B1.1(b)(10)(C) because defendant used sophisticated means in perpetrating the fraudulent scheme.  "A district court's finding that sophisticated means were used is a finding of fact reviewed for clear error."  *United States v. Barrington*, 648 F.3d 1178, 1199 (11th Cir. 2011).

The Guidelines provide for a two-level enhancement if the offense involved "sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means."  U.S.S.G. § 2Bl.1(b)(10)(C).

35

"Sophisticated means" refers to "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense," and ordinarily includes "[c]onduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts." *Id.*, § 2B1.1 cmt. n.9(B). For the enhancement to apply, each of defendant's individual actions need not be sophisticated. *See Barrington*, 648 F.3d at 1199; *United States v. Ghertler*, 605 F.3d 1256, 1267 (11th Cir. 2010). Instead, "the proper focus is on the offense conduct as a whole." *United States v. Bane*, 720 F.3d 818, 826 (11th Cir. 2013); *see Ghertler*, 605 F.3d at 1267. The enhancement is proper where the fraudulent scheme "involve[s] repetitive and coordinated activities by numerous individuals who used sophisticated technology to perpetrate and attempt to conceal the scheme." *Barrington*, 648 F.3d at 1199.

Exavier argues that the district court erred in applying the enhancement for sophisticated means because he did not personally fill out any tax returns or otherwise perform any sophisticated acts. Even if we assume that Exavier did not engage in acts that by themselves were sophisticated, because he intentionally engaged in and facilitated an overall scheme that was sophisticated, the district court did not err in applying the enhancement. *See* U.S.S.G. § 2Bl.l(b)(10)(C) (enhancement applies if offense involved "sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means").

36

Exavier created multiple companies to implement the scheme and the EFINs of these companies were used on hundreds of fraudulent tax returns. The scheme involved the collection of the personal identifying information, including social security numbers, of hundreds of deceased individuals. Exavier was the contact with SBTPG, an unwitting participant in helping direct refund checks of deceased individuals to his company accounts. In addition to his tax preparation businesses, Exavier operated a check cashing business which enabled him to cash refund checks payable to deceased individuals. The success of the scheme required the repeated coordination of multiple companies and individuals. Based on the trial record, the district court did not clearly err in applying the sophisticated means enhancement. *See Bane*, 720 F.3d at 826 (enhancement warranted because offense involved multiple corporations, an "intricate daily paper trail to mask the fraud," "repetitive coordinated conduct," and steps to conceal offense).

### 3. *Enhancement Under U.S.S.G. § 2B1.1(b)(11)*

Exavier argues that the district court erred in enhancing his sentence two levels for use of an authentication feature under U.S.S.G. § 2B1.1(b)(11)(A). The phrase "authentication feature" is used both in subsection (A) and (B) of Section 2B1.1(b)(11), which states in part as follows:

> If the offense involved (A) the possession or use of any (i) device-making equipment, or (ii) authentication feature; [or] (B) the production or trafficking of any (i) unauthorized access device or counterfeit access device, or (ii) authentication feature . . ., increase by

37

2 levels.

U.S.S.G. § 2B1.1(b)(11).

The Presentence Investigation Report proposed a two-level enhancement under Section 2B1.1(b)(11)(A)(ii) because "the offense involved the possession or use of an[] authentication feature." Defendant objected because the government had not shown he used an "authentication feature." In response, the government argued that social security numbers qualify as "access devices" and the offense involved "duplication of those numbers to file fraudulent returns." The government also cited evidence of "the production of counterfeit social security cards and driver's licenses." In the Addendum to the Presentence Investigation Report, the probation office adopted the government's position and clarified that "the more appropriate guideline cite in this case is [Section] 2B1.1(b)(11)(B), which addresses the production or trafficking of (i) any unauthorized access or counterfeit access device, or (ii) authentication feature."

At sentencing, neither the parties nor the district court directly addressed whether subsection (A) or (B) of U.S.S.G. § 2B1.1(b)(11) applied. Defendant continued to argue that the government had not shown a factual basis for the enhancement because he did not "possess or use an authentication feature," under subsection (A). The government responded that the offense involved "duplicating or producing" an "unauthorized access device," under subsection (B). Without

38

explicitly addressing the two ships passing in the night, the district court implicitly invoked subsection (A) in finding that "the offense involved the possession and/or use of any authentication feature and, therefore, the two-level enhancement [was] appropriate." In doing so, however, it also adopted the prosecutor's statements at sentencing and the government's sentencing memorandum "as additional reasons of the Court for [its] ruling." The district court's "additional reasons" necessarily relied on subsection (B). Read together, the district court essentially found that the enhancement was appropriate under both subsections (A) and (B).[4] We need not address subsection (A) because substantial evidence supports the district court's finding under subsection (B).

Social security numbers are "access devices." *United States v. Wright*, 862 F.3d 1265, 1275 (11th Cir. 2017); *see* § 2B1.1, cmt. n.10(A) (incorporating definition of "[u]nauthorized access device" from 18 U.S.C. § 1029(e)(3)). "Production" is broadly construed and "includes a situation in which a defendant willfully causes or induces an innocent third party to produce an unauthorized access device." *United States v. Taylor*, 818 F.3d 671, 678–79 (11th Cir. 2016). Here, because tax preparers duplicated social security numbers on electronic tax forms, Exavier's offense involved the production of unauthorized access devices.

---

[4] On appeal, the parties again fail to address the distinction between the two subsections.

The district court did not clearly err in imposing a two-level enhancement under U.S.S.G. § 2B1.1(b)(11).

## III.  CONCLUSION

Defendants' convictions and Exavier's sentence are **AFFIRMED**.